2008 WY 108

**David Labon BUSH, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–07–0247.

Supreme Court of Wyoming.

Sept. 17, 2008.

204

Representing Appellant: Diane Lozano, State Public Defender, PDP; Tina N. Kerin, Appellate Counsel; Kirk A. Morgan, Assistant Appellate Counsel. Argument by Mr. Morgan.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney

General; Jenny L. Craig, Assistant Attorney General. Argument by Ms. Craig.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] In 1990, Lynn Bush, the 26-year-old wife of David Labon Bush, disappeared. Fifteen and one-half years later, in 2006, the State charged Mr. Bush with first degree murder in connection with his wife's disappearance, although her body was never found. In 2007, after a 12 day trial, a jury convicted him of second degree murder.

[¶ 2] Mr. Bush appeals his conviction, claiming the district court violated his constitutional right to confront the witnesses against him and abused its discretion when it permitted two witnesses to testify about statements his daughter made to them during counseling and two other witnesses to testify by video teleconference. He also claims the district court violated his constitutional right to present a defense when it prohibited him from introducing evidence of an alternative suspect. Finally, he claims the State violated his right to due process when it waited fifteen and one-half years to file charges against him. Finding no reversible error, we affirm.

### ISSUES

[¶ 3] Stated succinctly, the issues Mr. Bush asks this Court to consider are:

1. Whether the district court violated his Sixth Amendment right to confront the witnesses against him or abused its discretion when it allowed a counselor and a psychiatrist to testify concerning statements his daughter made to them.

2. Whether the district court violated his Sixth Amendment right to confront the witnesses against him when it allowed two witnesses to testify by video teleconference.

3. Whether the district court committed reversible error when it excluded evidence of an alternative suspect.

4. Whether the delay in filing charges against him prejudiced his defense, thereby violating his right to due process.

### FACTS

[¶ 4] On December 9, 1990, Officer Mike Thompson responded to a call at a grocery store parking lot in Casper, Wyoming. When he arrived, Mr. Bush told the officer that his wife, Lynn, had gone to the store the previous day and never returned home. Mr. Bush said that he found her pickup truck parked in the lot, the driver's side door ajar and the keys lying on the ground nearby.

[¶ 5] On December 13, 1990, police officers served Mr. Bush with a search warrant and seized the pickup truck. They searched the pickup and found what appeared to be blood stains in numerous locations throughout the cab. According to one officer, as he was watching the search, Mr. Bush commented, "[W]hy are you doing this? I'm the murderer."

[¶ 6] Officers also sprayed the inside of the pickup with luminol [1] which indicated that a large amount of blood may have been in the passenger area. Police officers searched the Bush home and found a vodka bottle with what appeared to be blood on it. Police interviews of friends and family indicated that it was unlikely Mrs. Bush would have left home voluntarily without her daughter. Some of those interviewed also expressed their belief that Mr. Bush was somehow involved in her disappearance, in part because of comments he allegedly made about committing the perfect murder and disposing of a human body where it would never be found.

[¶ 7] Subsequent DNA testing identified the blood found in the pickup truck and on the vodka bottle as most probably that of Mrs. Bush. On July 31, 2006, fifteen and one-half years after Mr. Bush reported his wife

---

1. Officer James Keeran, a crime scene investigator with the Casper Police Department, testified that luminol is used to detect blood patterns that cannot be detected with the human eye. When sprayed on surfaces where blood is suspected to have been, including surfaces that have been wiped clean, it glows if blood is indicated.

missing, the State charged him with first degree murder in connection with his wife's disappearance. Mr. Bush entered a plea of not guilty and filed a motion to dismiss for violation of his due process rights, claiming the lengthy delay in charging him was prejudicial to his defense. The district court denied the motion after a hearing.

[¶ 8] Subsequently, the State filed a motion to exclude evidence of an alternative suspect. The district court heard argument on the motion and ruled that Mr. Bush must first demonstrate to the court that sufficient evidence supported his theory that someone else murdered his wife before he would be allowed to present the evidence to the jury. Mr. Bush filed an offer of proof and request for admission of alternative suspect evidence. The district court convened another hearing and concluded the evidence Mr. Bush presented was not sufficient to allow him to present the matter to the jury. The district court indicated, however, that Mr. Bush could ask for reconsideration of its ruling as the trial proceeded.

[¶ 9] A jury trial began on March 5, 2007. On March 20, 2007, the jury found Mr. Bush not guilty of first degree murder but guilty of second degree murder. Mr. Bush filed a motion for a new trial claiming that, given the ruling prohibiting him from presenting evidence of an alternative suspect, it was improper for the State to tell the jury in closing argument that he was the only person who had the opportunity to kill Mrs. Bush. After a hearing, the district court denied the motion. The district court sentenced Mr. Bush to a term of 45 years to life in the state penitentiary with credit for 325 days served prior to sentencing.

## DISCUSSION

### 1. Admission of Evidence of Mr. Bush's Daughter's Out–of–Court Statements— Abuse of Discretion or Violation of Confrontation Right

[¶ 10] During the trial, the district court allowed Lynn Gordon, a licensed professional counselor, and Dr. Robin Eicher, a board certified licensed psychiatrist, to testify concerning statements Mr. Bush's daughter made to them during their treatment of the child in 1991, 1992 and 1993, when the child was not yet five years old. Mr. Bush claims the district court abused its discretion in allowing the hearsay testimony and that its admission violated his Sixth Amendment right to confront the witnesses against him. The State responds that the district court properly admitted the statements under W.R.E. 803(4) and that Mr. Bush's Sixth Amendment right was not violated because the child's out-of-court statements were not testimonial and did not implicate the confrontation clause.

[¶ 11] The facts underlying the statements at issue are these: After Mrs. Bush disappeared, her daughter was removed from Mr. Bush's custody and placed in the legal custody of the Wyoming Department of Family Services (DFS) and the physical custody of her maternal grandparents.[2] The grandparents observed some unusual behaviors by the child and sought treatment for her at Northwestern Mental Health Society in Sheridan. Initially, Bruce Andrews cared for the child. In April of 1991, when the child was almost three years old, Ms. Gordon took over her care. Ms. Gordon treated the child for over two years, typically seeing her once per week. Over the course of the treatment, the child made statements to Ms. Gordon implicating Mr. Bush in her mother's disappearance.

[¶ 12] In the course of the custody proceedings, DFS referred the child to Dr. Eicher for an evaluation. Dr. Eicher saw the child twice in 1992 and once in 1993. During these sessions, the child made statements to her implicating Mr. Bush in her mother's disappearance.

[¶ 13] At the trial in 2007, the State called Mr. Bush's daughter, who was then 18 years old, to testify. She testified on direct

---

**2.** The record is not clear but it appears that law enforcement removed the child from Mr. Bush's home in late December 1990 because of concerns expressed by family members that she was not safe in his custody. She was placed in the temporary custody of her maternal grandparents where she remained, with scheduled supervised visits with Mr. Bush, until a custody hearing. After the hearing, the child remained in the custody of the grandparents.

examination that she could not remember any of the events in 1990. She testified that the counseling she had as a child pretty much made her unable to remember what had happened. Defense counsel did not cross-examine her.

[¶ 14] The State then called Ms. Gordon and Dr. Eicher to testify about the statements Mr. Bush's daughter had made as a child during therapy. Defense counsel objected to the testimony on hearsay grounds but did not object on the basis of the confrontation clause. Responding to the objection posed, the district court ruled that the statements were admissible under W.R.E. 803(4), as statements made for purposes of medical diagnosis or treatment.

[¶ 15] Ms. Gordon proceeded to testify that the child "talked about seeing mommy cut in two and put in two holes, and seeing mommy with blood wiped off of her." Ms. Gordon testified that the child told her that "daddy had hurt mommy and gave her an owie" and "would talk about mommy being cut and daddy cutting mommy." She testified that the child told her "Mommy is where the Christmas trees are," "Mommy got her head split open," "Daddy shot Mommy," and "Mommy is in Kaycee." Ms. Gordon testified that on one occasion the child took a toy knife, acted out cutting her belly and said, "This is how my mommy got cut." Ms. Gordon testified that the child consistently indicated that it was "daddy" that had hurt "mommy." The child also said that "daddy said don't say anything to [Ms. Gordon]" and "daddy said he would kill [me]." During one counseling session, she told Ms. Gordon her "mommy is dead," she is "in the mountain," and "Daddy is bad."

[¶ 16] Dr. Eicher testified that during her first meeting with the child, who was then four years old, she drew a picture of her mommy, put tape on the picture and said, "We have to put [tape] on our mommies' owies" and "let's just pretend she doesn't have an owie." She testified that the child said she did not "want to live with daddy; he might cut me, too." Dr. Eicher testified the child also told her that she "had a dream about my daddy killing my mommy." Dr. Eicher asked her what the dream was like, if it was like her memories or if it was different from her memories. She responded, "It was like what really happened." At the last session, the child told Dr. Eicher, "I don't like [my daddy] because he killed my mommy." We address first Mr. Bush's claim that the district court abused its discretion by admitting the hearsay testimony without limiting the purpose for which it could be considered.

## a. Admissibility of Hearsay Statements Under W.R.E. 803(4)

[1] [¶ 17] The record discloses that defense counsel objected to the testimony on the ground that the child's statements were not admissible for the truth of the matter asserted, i.e., that Mr. Bush killed Mrs. Bush, but only for the purpose of showing what information Ms. Gordon and Dr. Eicher relied upon in arriving at a diagnosis. Initially, therefore, the defense did not object to admission of the statements but only to the purpose for which they were admitted. The district court withheld ruling until the State established foundation for the statements during direct examination of Ms. Gordon. At that point, counsel approached the bench and the State argued that the foundation had been laid for admitting the statements under W.R.E. 803(4). Defense counsel asserted the testimony was not admissible because the purpose of Ms. Gordon's counseling was to assist the police with the criminal investigation; therefore, it did not fall within the medical treatment exception to the hearsay rule. Defense counsel asked to voir dire Ms. Gordon and the district court granted the request.

[¶ 18] During the voir dire, Ms. Gordon testified that she was in contact with the police department and the district attorney's office while she was treating the child. She testified that her purpose for those contacts was to find out what had happened to the child before she went to live with her grandparents. Ms. Gordon denied that she was assisting the police department or the district attorney's office with their investigation into Mrs. Bush's disappearance and testified that her only reason for seeing the child was to help her.

[¶ 19]   After the *voir dire,* counsel again approached the bench and defense counsel argued that Ms. Gordon had served a dual purpose—she treated the child and assisted the police with the criminal investigation. Defense counsel asked for a limiting instruction telling the jury that the statements were admitted for the purpose of showing what information Ms. Gordon relied upon in treating the child but not for the truth of the child's statements that Mr. Bush killed Mrs. Bush. The district court ruled as follows:

> I think the statements can come in as an exception to the hearsay rule under 803, sub (4).   I can envision circumstances where a witness is sent to medical treatment to get around the rule; and in that case, I think that kind of subterfuge would not allow the statements to be used substantively.   There is no indication here. Ms. Gordon has indicated her primary purpose was diagnosis and treatment of [the child].   If those statements were used secondarily for law enforcement purposes, that does not render them not available under the exception.   So I'm not going to give the limiting instruction.   I'm ruling they may come in and be considered by the jury for substantive purposes.

[¶ 20]   We review a district court ruling on the admissibility of evidence for abuse of discretion and will not disturb its ruling absent a clear abuse. *Negrette v. State,* 2007 WY 88, ¶ 11, 158 P.3d 679, 682 (Wyo.2007). An abuse of discretion occurs when it is shown the trial court reasonably could not have concluded as it did. *Id.*

[¶ 21]   W.R.E. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." [3]   Pursuant to W.R.E. 802, hearsay generally is not admissible unless it falls within an exception.   Rule 803 provides in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (4) *Statements for purposes of medical diagnosis or treatment.*—Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment[.]

[¶ 22]   Pursuant to this provision, we have held that a child's statements to a medical professional or professional counselor may be admitted into evidence provided the proper foundation is laid—that the child's statements were consistent with the purposes for which the witness became involved with the child, and the witness relied on the statements in connection with diagnosis and treatment of the child.   *Simmers v. State,* 943 P.2d 1189, 1197–1198 (Wyo.1997).

[¶ 23]   Ms. Gordon testified that she began seeing the child at the request of her maternal grandparents, who were concerned about her behavior after her mother's disappearance.   Her grandmother testified that the child was having nightmares, was angry and scared and was losing weight.   She said she sought treatment for the child because she believed the child needed help.

[¶ 24]   Ms. Gordon testified that her sole purpose for seeing the child was treatment. She testified that she relied on the child's statements to arrive at a diagnosis of post-traumatic stress disorder.   Ms. Gordon testified that it is particularly important in her field to collect a history of the patient from family members and the patient herself.   She testified it is also important when dealing with post-traumatic stress disorder to identify the source of the disorder.

---

**3.**   Pursuant to W.R.E. 801(d)(1)(C), a statement is not hearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is one of identification of a person made after perceiving him.   Arguably, the child's statements were not hearsay because she testified at the trial, was subject to cross-examination concerning her statements to Ms. Gordon and Dr. Eicher and her statements identified Mr. Bush as having killed her mother.   The State did not make this argument and the district court treated the statements as hearsay.   Consequently, we accept, without deciding, that the statements were hearsay.

[¶ 25] Dr. Eicher testified that DFS referred the child to her for evaluation during the custody matter. She testified that she did not conduct a forensic interview for purposes of criminal or custodial proceedings. She saw the child three times and diagnosed her as having severe post-traumatic stress disorder as a result of having seen her mother hurt by her father. In arriving at her diagnosis, Dr. Eicher relied primarily on the child's statements and play during the sessions.

[¶ 26] The witnesses' testimony showed that the child's statements were consistent with their purpose for seeing the child—treatment and diagnosis. Their testimony also showed that they relied on the child's statements in connection with diagnosing and treating her. Therefore, the district court properly admitted the statements under W.R.E. 803(4) and did not abuse its discretion in doing so. We turn to Mr. Bush's contention that admission of the statements violated his Sixth Amendment right to confront the witnesses against him.

### b. Admissibility of the Statements in Light of the Confrontation Clause

■ [¶ 27] Mr. Bush claims that his constitutional right to confront the witnesses against him was violated when his daughter testified that she could not remember what happened in 1990, effectively making her unavailable, and the district court allowed her testimonial hearsay statements to be presented through Ms. Gordon and Dr. Eicher. The State likewise treats the daughter as having been unavailable to testify at trial but responds that Mr. Bush's confrontation rights were not violated because his daughter's out-of-court statements were non-testimonial and did not implicate the confrontation clause. The State also contends that we must review this issue for plain error because, although Mr. Bush objected to the testimony on the basis of the hearsay rules, he did not specifically object on the grounds that it violated his confrontation right. We begin our discussion by considering whether the plain error standard applies.

[¶ 28] The State cites *Vigil v. State,* 2004 WY 110, ¶ 15, 98 P.3d 172, 177 (Wyo.2004), in which we said:

> While the Confrontation Clause and hearsay may overlap, they are distinct concepts and objections grounded upon these principles incorporate separate analyses. Hence, separate objections should be made for hearsay violations and confrontation clause violations in order to fairly alert the trial court so it can make an informed decision based upon the specific legal issues involved. (Citations omitted).

In *Vigil,* we reviewed the alleged error for abuse of discretion because the attorney referred to the declarant's unavailability during the objection. We found that reference sufficient to place the trial court on notice that the objection implicated the confrontation clause. Quoting a Nevada case, we concluded:

> When a hearsay objection is lodged, as here, on the grounds that the declarant has not been made available at trial and, as a result, cannot be subjected to cross-examination, the policy of the confrontation clause is invoked equally with that of the hearsay rule. We therefore hold that the hearsay objection lodged in the instant case adequately preserved the confrontation clause issue for review.

*Id.,* ¶ 16, 98 P.3d at 177 (citation omitted).

■ [¶ 29] In Mr. Bush's case, defense counsel's objection was based exclusively on the hearsay rule. In the ten pages of trial transcript in which the district court and counsel discussed the objection, there is no reference to the confrontation clause or the declarant's unavailability. Rather, the focus of defense counsel's objection was that the testimony should not be admitted for the truth of the matter asserted, but instead for the limited purpose of showing what information the witnesses relied on in reaching their opinions. Defense counsel attempted to show that the primary purpose of the counseling was not treatment but to help with law enforcement's investigation. Given that the confrontation clause was never mentioned, we review Mr. Bush's claim that admission of the testimony violated his right of confrontation for plain error. Plain error exists when:

1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right which materially prejudiced him. *Szymanski v. State*, 2007 WY 139, ¶ 28, 166 P.3d 879, 886 (Wyo.2007).

[¶ 30] Applying these factors, we hold that the admission of the daughter's out-of-court statements did not violate the confrontation clause and there was no plain error. We reach this result, however, on different grounds than those argued by the parties. We conclude the daughter was not unavailable for purposes of the confrontation clause. Rather, she appeared at trial, was placed under oath and testified. Thus, Mr. Bush was confronted with the witness and had the opportunity to cross-examine her and the Sixth Amendment was satisfied.

█ [¶ 31] The confrontation clause of the Sixth Amendment gives the accused the right to be confronted with the witnesses against him. This has long been read as securing an adequate opportunity to cross-examine adverse witnesses. *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). Thus, in *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Court held the admission at trial of preliminary hearing testimony did not violate the confrontation clause when the witness who gave the testimony subsequently appeared at trial and was subject to cross-examination about his earlier testimony. Similarly, in *Delaware v. Fensterer*, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985), the Court held there was no confrontation clause violation when the State's expert witness testified at trial concerning his opinion but said he could not remember the method he used to form his opinion. The Court said:

> The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.* Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. This conclusion is confirmed by the fact

that the assurances of reliability our cases have found in the right of cross-examination are fully satisfied in cases such as this one, notwithstanding the witness' inability to recall the basis for his opinion: the factfinder can observe the witness' demeanor under cross-examination, and the witness is testifying under oath and in the presence of the accused.

*Id.* at 19, 106 S.Ct. 292 (citations omitted; emphasis in original).

[¶ 32] Neither *Green* nor *Fensterer* considered the admissibility of a witness's unsworn, out-of-court statement concerning events he was unable to remember by the time of trial. In *Owens*, 484 U.S. at 559–60, 108 S.Ct. 838, the Court specifically addressed that issue. There, the victim identified the defendant as his assailant a couple of weeks after he was assaulted. At trial 18 months later, the victim testified that he remembered identifying the defendant a year and a half before but, because of profound memory loss resulting from the assault, presently had no memory of who attacked him. The trial court admitted the earlier out-of-court statement in which the victim identified the defendant.

[¶ 33] The defendant appealed claiming the admission of the out-of-court statement violated his confrontation right because the witness's profound memory loss deprived him of the opportunity to effective cross-examination. The circuit court of appeals agreed and reversed the conviction. On *certiorari*, the United States Supreme Court reversed, holding the admission of the out-of-court statement did not violate the confrontation clause because the witness appeared at trial, was sworn and was subject to cross-examination. The defendant had the opportunity to confront the witness; confrontation is what the Sixth Amendment is intended to protect; consequently, the defendant's right was not violated.

[¶ 34] More recently, in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court re-affirmed that confrontation is the foundation of the Sixth Amendment right:

Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior statements.... The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.

*Id.* at 59, n. 9, 124 S.Ct. 1354.

[¶ 35] Following the lead of the United States Supreme Court, a number of state courts have held that the admission of out-of-court statements of a witness who appears at trial and testifies that he or she cannot remember the relevant events or his or her statements does not violate the confrontation clause. In *State v. Price*, 158 Wash.2d 630, 146 P.3d 1183 (2006), for example, a child told her mother and a police officer that the defendant had sexually abused her. At trial, the prosecution called the child as a witness and when asked about the events and what she had told her mom she answered, "Me forgot" or shrugged her shoulders. The trial court allowed the child's mother and the police officer to testify concerning what the child had told them.

[¶ 36] On appeal, the defendant argued that the child's inability to remember rendered her unavailable for purposes of the confrontation clause and that he had no prior opportunity to cross-examine her concerning her statements to her mother and the police. The Washington Supreme Court concluded the confrontation clause was not violated because the child was physically present in the courtroom and confronted the defendant face to face; she was competent to testify and did so under oath; the defense had a full opportunity to cross-examine her; and the judge, jury and defendant were able to view her demeanor and evaluate for themselves whether she was being truthful about her lack of memory. Thus, the court concluded, all of the purposes of the confrontation clause

were satisfied even though the witness indicated she was unable to recall. As in *Owens*, the court held that an inability to remember does not render a witness unavailable for confrontation clause purposes.

[¶ 37] Other courts have also addressed the issue and concluded that admission of an out-of-court statement when a witness testifies he or she does not remember the statement or the events described in the statement does not violate the confrontation clause. *See Tucker v. State*, 564 A.2d 1110 (Del.1989) (holding that the confrontation clause was not violated when a child's out-of-court statements were admitted after she testified and was unable or unwilling to respond to questioning); *State v. Desantiago*, 365 Ill.App.3d 855, 303 Ill.Dec. 61, 850 N.E.2d 866 (2006) (holding that one witness's trial testimony concerning a second witness's grand jury testimony did not violate the confrontation clause when the second witness testified at trial that he had no memory of the grand jury proceeding); *Fowler v. State*, 829 N.E.2d 459 (Ind.2005) (holding that an officer's trial testimony concerning a domestic violence victim's statements did not violate the confrontation clause when the victim appeared at trial and refused to answer questions and the defense allowed her to leave the stand without challenging her refusal).

[¶ 38] As these cases reflect, what is important for purposes of the Sixth Amendment is that the defendant is confronted by the witnesses against him at trial and has the opportunity to cross-examine them. Mr. Bush was confronted by his daughter at trial, she testified under oath and he had the opportunity to cross-examine her. Her testimony on direct examination that she did not remember the 1990 events does not affect our conclusion that the admission of her statements did not violate the confrontation clause.[4]

---

4. In reaching this result, we are cognizant of the following paradox: the same person can be both "subject to cross-examination" under W.R.E. 801(d)(1) and "unavailable as a witness" under W.R.E. 804(a), which provides in relevant part:

*(a) Definition of unavailability*—"Unavailability as a witness" includes situations in which the declarant:

. . . .

(3) Testifies to a lack of memory of the subject matter of his statement[.]

In *Owens*, 484 U.S. at 563, 108 S.Ct. 838, the United States Supreme Court characterized this paradox as a "semantic oddity," and not an "internal" or "substantive" inconsistency. For purposes of Mr. Bush's confrontation claim,

[¶ 39] As previously mentioned, the starting point for both Mr. Bush's argument and the State's response was that the daughter's lack of memory made her unavailable to testify and be cross-examined. Based upon the authorities cited, we have concluded otherwise. However, our ultimate holding that Mr. Bush's confrontation right was not violated by the admission of his daughter's out-of-court statements would be the same under the parties' approach. Even if the daughter had been unavailable for purposes of the confrontation clause, the admission of her out-of-court statements did not violate the Sixth Amendment because they were not testimonial, i.e., their primary purpose was not to establish or prove past events potentially related to later criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). As reflected in Ms. Gordon's and Dr. Eicher's testimony, the primary purpose of the statements was for treatment and diagnosis. Such non-testimonial statements do not implicate the confrontation clause. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354.

[¶ 40] Mr. Bush also argues that the admission of his daughter's statements violated his confrontation right because there was no way to show at trial in 2007 that she was competent at three, four or five years old to make the statements she made. In support of this argument, he cites *King v. Brasier*, 1 Leach 199, 168 Eng. Rep. 202 (1779), a case decided before the existence of either the confrontation clause or the exceptions to the hearsay rule, in which the court held that a mother could not testify concerning statements her child made to her because the child had been found incompetent to take the oath and testify. Mr. Bush also cites *Morganflash v. State*, 2003 WY 120, ¶ 6, 76 P.3d 830, 833 (Wyo.2003), in which we reiterated the rule requiring trial courts to conduct an independent competency examination when a child is called to testify and his or her competency is called into question. Both *King* and *Morganflash* addressed the competency of a

child, who has been called to testify as a witness, to understand the oath and the importance of telling the truth. Neither case addressed the situation Mr. Bush raises where the three-year-old child who made the statements was 18 years old when she was called as a witness, her competency at the time of trial was not questioned, and her competency as a three-year-old could not be directly examined. The parties cite no case involving similar circumstances and we have found none.

[¶ 41] However, in *State v. Muttart*, 116 Ohio St.3d 5, 875 N.E.2d 944, 954 (2007), *cert. denied*, ─ U.S. ─, 128 S.Ct. 2473, 171 L.Ed.2d 769 (2008), the Ohio Supreme Court held that regardless of whether a child was determined to be competent to testify, the child's out-of-court statements were admissible as an exception to the hearsay rule if they were made for purposes of medical diagnosis or treatment. The court held further that because the statements were made for purposes of medical diagnosis and treatment, they were not testimonial and their admission did not violate the confrontation clause.

[¶ 42] We have already concluded the child's statements in the present case were made for purposes of medical treatment and diagnosis. Thus, they were admissible under W.R.E. 803(4) whether or not the child was competent at the age of three when she made them. *Muttart*, 875 N.E.2d at 954. *See also* Christopher B. Mueller and Laird Kirkpatrick, *Federal Evidence* § 8.5, 48 (3rd ed.2008) (stating, "Competency restrictions do not affect the admissibility of statements offered under hearsay exceptions.") Because the statements were made for purposes of medical diagnosis and treatment, they also were not testimonial and their admission would not have violated the confrontation clause even if the declarant had not appeared at trial, testified and been subject to cross-examination.

what is important is that his daughter was present, testified and was subject to cross-examination concerning her statements. That the defense chose not to cross-examine her also does not affect our conclusion. *Fowler*, 829 N.E.2d at

469; *Torres*, 971 P.2d at 1275–76. Had it done so and had she continued to deny any memory of the events or her statements, an argument could have been made that she was "unavailable" because she was not cross-examinable.

### 2. Violation of Confrontation Clause—Witness Testimony by Video Teleconference

[¶ 43] The State intended to call Paul and Caroline Martin to testify at trial that they were traveling on I–25 from Casper to Story, Wyoming early in the morning on December 8, 1990, when the Bushes' pickup truck passed them at a high rate of speed. They recognized the pickup as belonging to the Bushes because they worked at Casper College where Mrs. Bush also worked, they had gotten to know her and Mr. Bush and they knew the Bushes drove a black Ford pickup truck with the license plate 1–BUSH. Inside the cab, the Martins saw two people, a driver and a smaller passenger seated immediately next to the driver. In the bed of the pickup, they saw several large plastic bags.

[¶ 44] On the eighth day of trial, the State asked the district court to allow it to present the Martins' testimony by telephone. The State informed the court that Mr. Martin had suffered congestive heart failure one week before and was unable to travel from his home in La Junta, Colorado to Wyoming. The State represented to the court that Mr. Martin was seriously ill and Mrs. Martin was reluctant to leave him. The State indicated the Martins could travel to the district attorney's office in La Junta and testify by telephone or video teleconference.

[¶ 45] Defense counsel objected to the presentation of the Martins' testimony by telephone or video teleconference as violating Mr. Bush's right to confront the witnesses against him. After a lengthy discussion of the law, the district court denied the request but advised the State it would reconsider the issue if new information came to light.

[¶ 46] The following day, the State brought the matter of the Martins' testimony to the court's attention again. The State informed the district court that new information from Mr. Martin's physician indicated that he suffered from congestive heart failure with severe left ventricular dysfunction, cardiomyopathy, chronic renal failure, and anemia of chronic disease, and his condition was profoundly poor. The State further informed the district court that arrangements had been made for the Martins to appear and testify by video teleconference, rather than by telephone, at the La Junta district attorney's office.

[¶ 47] Defense counsel maintained her objection on the basis of the confrontation clause as to both of the Martins' testimony and, with respect to Mrs. Martin, argued that she was able to travel and ought to be required to appear if the State intended her to testify. The State responded that Mrs. Martin's testimony would be merely corroborative of Mr. Martin's testimony and so, under *Ryan v. State*, 988 P.2d 46, 59 (Wyo.1999), its admission by video teleconference did not violate Mr. Bush's confrontation right. The district court ruled that it would allow the testimony of both Mr. and Mrs. Martin by video teleconference, finding that Mr. Martin's condition was serious and severe and he should not travel; under the circumstances, it would be greatly stressful for Mrs. Martin to leave her husband of 60 years to travel to Wyoming to testify; and the State's arrangements for video teleconferencing resolved many of the confrontation concerns.

[¶ 48] Mr. Bush's claim that he was denied the right of confrontation arises under the Sixth Amendment. Issues arising under the constitution are questions of law which we review *de novo*. *Hannon v. State*, 2004 WY 8, ¶ 11, 84 P.3d 320, 328 (Wyo.2004). Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed absent a showing of a clear abuse of discretion. *Vigil*, ¶ 17, 98 P.3d at 177. Because the matter at hand involves a mixed question of fact and constitutional law, we independently review the record. *Id.*

[¶ 49] The Sixth Amendment protects the right of an accused to confront the witnesses against him. Generally, this means witnesses who testify against a defendant in a criminal proceeding must appear at trial. The right, however, is not absolute and may be compromised under limited circumstances. *Maryland v. Craig*, 497 U.S. 836, 848, 110 S.Ct. 3157, 3165, 111 L.Ed.2d 666 (1990). The confrontation clause reflects a *preference* for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the

necessities of the case. *Id.* (emphasis added).

A defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where the denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.

*Id.* Accordingly, the presentation of witness testimony by video teleconference is not permissible unless: 1) it is necessary to further an important public policy, and 2) the reliability of the testimony is otherwise assured.

[¶ 50] This Court has not previously addressed the issue of whether a defendant's confrontation right was violated by presentation of witness testimony via video teleconference.[5] Other jurisdictions that have applied the *Craig* test have reached varying results depending upon the particular circumstances of the case. In *Horn v. Quarterman*, 508 F.3d 306, 320 (5th Cir.2007), the court upheld a district court ruling allowing a terminally ill witness to testify via two-way closed-circuit television. The appellate court based its ruling primarily on two factors. First, the district court had confirmed that the treating physician advised that it would be medically unsafe for the witness to travel and strongly recommended against it. Second, the district court had expressly found that the two-way closed-circuit television preserved the constitutional safeguards of administering the oath and having the witness testify on direct and cross examination in full view of the jury, defendant, defense counsel and court. Similarly, in *Marx v. State*, 987 S.W.2d 577, 580–81 (Tex.Crim.App.1999), the court upheld the admission of testimony via two-way-closed circuit television, finding that it was necessary to protect the witnesses from emotional trauma, and the reliability of their testimony was assured because they testified after promising to do so truthfully,

they were subject to cross-examination, and the jury was able to observe their demeanor.

[¶ 51] In contrast, in *U.S. v. Yates*, 438 F.3d 1307 (11th Cir.2006), the court reversed a district court ruling allowing two witnesses to testify from Australia by two-way video conference. The State had asserted the witnesses were unwilling to appear at trial, their testimony was important, and allowing them to appear by video conference was convenient and would expeditiously resolve the case. The district court allowed the testimony without applying the two-part *Craig* test. The court of appeals concluded the State had failed to make the requisite showing that denial of the confrontation right was necessary to further an important public policy (convenience, the importance of testimony and expeditious resolution are factors in every criminal case) and the district court had failed to apply the *Craig* test.

[¶ 52] Pursuant to *Craig*, presentation of the Martins' testimony by video teleconference was appropriate only upon a showing that it was necessary to further an important public policy and its reliability was otherwise assured. As in *Horn*, the district court in Mr. Bush's case confirmed through medical records that Mr. Martin's condition was "serious and severe and not temporary" and that his physician advised against him traveling from La Junta, Colorado to Casper, Wyoming. The district court concluded that it would not be appropriate to recess and wait for Mr. Martin to recover because, if he recovered, it would be a long time. The district court also considered the reliability of the testimony, first, by telephone and, then, by video conference. The district court indicated its concerns about the testimony were substantially reduced when the State arranged to present the testimony by video conference.

[¶ 53] We conclude the district court properly applied the *Craig* test. Mr. Martin's testimony via video conference was nec-

---

5. In *Ryan*, 988 P.2d at 59, we considered whether the defendant's confrontation right was violated when a witness testified by video teleconference and the quality of the technology was poor. The defendant did not object to the quality of the sound or complain that he could not hear the testimony. Additionally, the witness testimony

was cumulative of other testimony. Under those circumstances, we held that the district court properly denied the motion to strike the testimony. We did not address the question of whether his confrontation right would have been violated if the technology had worked properly.

essary to further the important public policy of preventing further harm to his already serious medical condition. The reliability of his testimony was otherwise assured by the facts that he appeared in the La Junta district attorney's office and was sworn by the district court, gave testimony and was subjected to cross-examination before the jury, Mr. Bush, defense counsel and the court via live broadcast. The district court further assured the reliability of his testimony by ordering Mrs. Martin to be out of the room during her husband's testimony. We hold that the district court properly admitted Mr. Martin's testimony by video conference and did not violate Mr. Bush's confrontation right.

[¶ 54] Our conclusion concerning Mr. Martin's testimony does not resolve the issue with respect to Mrs. Martin's testimony. Although the reliability of her testimony was otherwise assured for the same reasons as Mr. Martin's, Mrs. Martin was not ill and there was no medical recommendation against her traveling. The district court acknowledged these different circumstances but allowed her testimony by video conference because she and Mr. Martin had been married for 60 years, she was justifiably concerned about her husband, it "would be greatly stressful for her to have to come here" and "her time away would be very difficult for her given her husband's circumstances." We have found no cases in which any court has considered whether circumstances such as these were sufficient to show testimony by video conference was necessary to further an important public policy. We hold that the district court erred in allowing Mrs. Martin to testify by video teleconference. However, the error was harmless because her testimony was cumulative of her husband's testimony. *Ryan*, 988 P.2d at 59.

### 3. Denial of Alternative Suspect Evidence

[¶ 55] Prior to trial, the State filed a motion to exclude evidence of alternative suspects until Mr. Bush produced an adequate evidentiary basis for its admission. The State asserted that Mr. Bush had attempted to blame his half brother, Glendol Bush, who was an escapee from the Wyoming State Conservation Camp at the time Mrs. Bush disappeared. The State alleged that a law enforcement investigation showed Glendol Bush was not in Wyoming during the period in question. Citing case law from a variety of jurisdictions, the State asserted that alternative suspect evidence was not admissible unless it showed a chain of circumstances clearly pointing to someone other than the defendant. The district court entered an order granting the State's motion to exclude evidence of alternative suspects until such time as the defense demonstrated to the court "that a quantum of evidence exists that would allow such evidence to be introduced" at trial.

[¶ 56] Following the court's order, Mr. Bush submitted an offer of proof and request for admission of alternative suspect evidence. He listed the following evidence in support of his request:

Theresa Bush's recorded statement to the police on August 1, 2005 in which she said that when she called on December 9, 1990 to report her daughter-in-law's disappearance, she told the police that she was very concerned about David's step brother who had escaped from the conservation camp. She also stated that she told the police they needed to take this seriously. In her August 2005 statement, she said her concern at the time "was not about David. It was more about Glenn."

Julia Hayfield's statement that she was in the Buttrey parking lot late in the afternoon on December 8, 1990 and saw a dark colored truck with the license plate 1–BUSH driven by a dark haired woman pull into the lot. She saw the woman get out of the truck. She was big across the shoulders and wearing stone washed jeans and a waist length jacket.

Doris Lore's statement that she was in the Buttrey parking lot at approximately 5:30 p.m. on December 8, 1990 and saw a tall male and a short female arguing in the parking lot. They got into a Datsun and drove away.

On Monday, December 10, 1990, Deputy Rodstad of the Natrona County Sheriff's Office observed a small pickup by Red

Draw in Natrona County. The registration was for a black Datsun.

Sue Moore's statement to the sheriff's office on December 13, 1990 that on Sunday, December 9, 1990, around 4:00 p.m., she saw a man walking around Fremont Canyon. He was 5'6" tall and wore glasses and a cap. When shown a picture of David Bush, she said he was not the man she saw.

Lucille Mark's statement to the sheriff's office on July 16, 1991 that her nephew Glendol Bush had been calling her that evening and told her that Mrs. Bush's body could be found at Hell's Half Acre. She stated that he told her he did not kill Mrs. Bush, his brother David committed the murder.

Trudy Dooling's statement to police in 1992 that she believed Glendol Bush was in Casper at the time Mrs. Bush disappeared.

Michelle Longwedl's statement to police in June of 2005 that she thought Glendol Bush was important to the case involving her sister's disappearance. She also said that about two weeks before she disappeared her sister had told her she did not want Glendol Bush in her house.

David Christopher Dryden's statement to police in May of 2006 that sometime between 1992 and 1994 Glendol Bush confessed to him in prison that he had killed Mrs. Bush. In his statement, Mr. Dryden indicated Glendol said he shot Mrs. Bush on Muddy Mountain, cut her up with a military shovel and stuffed her into a green army duffle bag. Mr. Dryden could not remember for sure, but thought maybe Glendol had said he buried her body.

The defense also asserted in its offer of proof that law enforcement's investigation into the whereabouts of Glendol Bush on December 8 and 9, 1990 showed only that someone used David Bush's name in Texas and New Mexico that weekend. It did not provide a description of the individual and did not definitively show that Glendol Bush was the individual using David Bush's name.

[¶ 57] Following a hearing, the district court concluded that the evidence the defense presented in its offer of proof was not sufficient to allow its presentation to the jury. In support of its ruling, the district court referenced *Holmes v. South Carolina,* 547 U.S. 319, 327, 126 S.Ct. 1727, 1733, 164 L.Ed.2d 503 (2006) in which the Court quoted with approval the following rule:

> [T]he accused may introduce any legal evidence ... tending to prove that another person may have committed the crime with which the defendant is charged. Such evidence may be excluded where it does not sufficiently connect the other person to the crime, ... is speculative or remote, or does not tend to prove or disprove a material fact in issue.

Emphasizing that *Holmes* allows the introduction of "legal" evidence, the district court stated:

> [T]he suspicions of some of the other proposed witnesses that Glendol Bush may have been here and committed the crime [are] not sufficient. I am inclined to think that the descriptions are so general as to not be helpful, and confusing. I have reservations about the testimony of Mr. Dryden.

The district court continued its previous ruling granting the State's motion in limine but indicated the defense could raise the issue again at any point during the trial.

[¶ 58] Mr. Bush contends the district court denied his constitutional right to present a complete defense when it prohibited him from presenting evidence implicating his brother in his wife's disappearance. To the extent his claim involves a constitutional issue, we review it *de novo. Hannon,* ¶ 13, 84 P.3d at 328. We review the evidentiary issue for abuse of discretion. *Vigil,* ¶ 17, 98 P.3d at 177.

[¶ 59] The United States Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986); *Hannon,* ¶ 62, 84 P.3d at 346. "[T]he Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote." *Holmes,* 547 U.S. at 327, 126 S.Ct. 1727. However, the Constitution does

not prevent trial judges from applying well-established rules of evidence to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *Id.* The Constitution permits judges to exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice or confusion of the issues. *Id.* "A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." *Id.*

[¶ 60] This Court has not had occasion to address for many years the propriety of excluding defense evidence that someone other than the defendant committed the offense charged. In *Horn v. State,* 12 Wyo. 80, 133, 73 P. 705, 715 (1903), the defendant claimed the trial court erred in excluding evidence that there had been trouble between the murder victim's family members and their neighbors, including an altercation in which the victim ran a neighbor's son down with his horse and the neighbor pulled a gun and threatened to shoot the horse. In ruling that the evidence was properly excluded, the Court said:

> The offer in the case at bar was not to show an ill feeling on the part of one individual, but of several, and it was not connected with any other offer to show overt acts on the part of such individuals toward the commission of the crime charged against the prisoner, nor even an opportunity on their part to have perpetrated the crime. * * * The offer was limited to the showing of a possible motive on the part of some one to do some injury to some member of the Nickell family, and perhaps to take the life of some member of that family. * * * We do not perceive that the offered testimony would have had any reasonable tendency to establish the innocence of the defendant. Its effect, if any, could have been no greater than to generate a mere suspicion that some other person might have committed the crime solely because he entertained a feeling of ill will or hatred against the Nickell family at some time and may have uttered threats

of taking life. The evidence offered does not come within the rule relied on by counsel for plaintiff in error, and the court did not err in excluding it.

[¶ 61] Only slightly more recently, this Court addressed the issue again in *Lampitt v. State,* 34 Wyo. 247, 242 P. 812 (1926). Mr. Lampitt was convicted of first degree murder in connection with an explosion that killed a man. He claimed the trial court erred in excluding evidence that vehicles were was in the area a few minutes before and after the explosion. This Court said:

> No offer was made to connect up such facts with other facts tending to show in any way that the occupants of these cars had anything whatever to do with the explosion. The offered testimony could, accordingly, have no other effect than to raise a possible suspicion that the person or persons in these cars might have had something to do with the crime for which defendant was tried, and comes accordingly clearly within the rule laid down in *Horn v. State,* 12 Wyo. 80, 73 P. 705, where it was held that testimony offered by a defendant on trial for murder, which would merely have generated a suspicion that some other person might have committed the crime, is properly excluded.

*Id.* at 817.

[¶ 62] We have not had occasion to address the issue since. However, other courts that have addressed the issue more recently have applied similar standards to those this Court applied long ago in *Horn* and *Lampitt.* These standards require that the proffered evidence demonstrate a direct nexus between the third party and the crime charged.

[¶ 63] In *U.S. v. McVeigh,* 153 F.3d 1166 (10th Cir.1998), for example, the court considered evidence suggesting that persons connected with a white-supremacist, anti-government group known as Elohim City were involved in the conspiracy to bomb the Murrah Building. Specifically, the defendant proffered testimony from an undercover government informant who would have testified that the group's leaders violently opposed the federal government, had instructed her in preparing napalm, had shown her bomb com-

ponents, discussed their experience in building and exploding a 500–pound ammonium nitrate bomb and discussed targeting a federal building in Oklahoma. The informant also would have testified that a man who came to Elohim City in 1995 previously had developed plans to bomb the Murrah Building. She also would have testified that she saw two men in the group who resembled the suspects the government originally sought after the bombing.

[¶ 64] The Tenth Circuit Court of Appeals upheld the exclusion of this evidence, finding that even if the proffered testimony had some marginal relevance, its probative value was slight because of its generalized and speculative nature. The Court said:

> The fact that another group held similar anti-government views as did McVeigh and that some of its members expressed vague threats to bomb a variety of potential targets in Oklahoma, possibly including a federal building in Oklahoma City, says very little about whether this group actually bombed the Murrah Building. That others shared McVeigh's political views is a slender reed upon which to vault the dangers of unfair prejudice and jury confusion. Howe's alleged identification of "John Doe 1" and "John Doe 2" arguably increases the probative value of her other testimony. However, the composite sketches included no particular identifying features that would strengthen the significance of Howe's allegation of two matches. In fact, there are undoubtedly thousands of men across America who resembled the government's composite sketches. Finally, there was no evidence in this proffer, or in the record, that would establish a probative nexus between the alleged Elohim City conspiracy and the bombing of the Murrah Building.

[¶ 65] Similarly, in *State v. Brown,* 285 Kan. 261, 173 P.3d 612 (2007), the Kansas Supreme Court considered the following alternate suspect evidence: (1) an individual with an allegedly similar physical description to Brown and allegedly similar motive, was involved in a fight at the scene of the killing; (2) another individual was also involved in a fight at the scene and had a similar physical

description to Brown; (3) a police officer stopped two individuals leaving the scene of the shooting with the lights of their vehicle turned off; (4) another officer received a telephone call from an individual who said the police had the wrong person in custody for the shooting; and (5) hearsay evidence a woman contacted law enforcement and told them another man called her around the time of the shooting and told her he had just shot someone in the head in "Old Town." *Id.* at 640. The Court upheld the exclusion of this evidence, concluding that some of it was pure hearsay, most of it was baseless innuendo and none of it connected the third parties to the shooting. *Id.* at 641.

[¶ 66] In *State v. Cotto,* 182 N.J. 316, 865 A.2d 660 (2005), the Court applied a similar standard. There, a fellow inmate of the defendant made statements implicating a relative in committing the crime. The court said that to be admissible the evidence must demonstrate a link between the relative and the victim or the crime. *Id.* at 670. Concluding that no such link was demonstrated, the court held the evidence was properly excluded. The court further held that even if the evidence had demonstrated a link between the third party and the crime, the district court could have excluded it on the ground that it consisted entirely of inadmissible hearsay. *Id.*

[¶ 67] Taking this same approach, in *United States v. Hall,* 165 F.3d 1095 (7th Cir.1999), the court upheld the exclusion of alternate suspect evidence in a case involving kidnapping and transportation of the victim across state lines where the victim's body was found several weeks later in an Indiana cornfield. Prior to trial, the defendant filed a motion seeking the admission of statements indicating a third party committed the crime. Some of the statements implicated an individual who, according to witnesses, stated that he needed to get out of town because of the abduction and the victim would "be found in harvest time." *Id.* at 1108. The defendant also sought to introduce a confession by another individual that he picked up the victim, had sex with her and dropped her off in a cornfield in Indiana. *Id.* In upholding the exclusion of the statements and the confes-

sion, the appellate court concluded, first, there was an insufficient showing as to the trustworthiness of the statements as required under F.R.E. 803(24) and 804(b)(3) and, second, the exclusion did not violate due process because there was an inadequate showing that the statements were reliable.

[¶ 68] With these cases in mind, we consider the evidence Mr. Bush sought to have admitted to show that his step brother, Glendol, committed the offense charged. The statements of Theresa Bush, Ms. Longwedl and Ms. Dooling that they were concerned about Glendol Bush or thought he was important to the case or believed he may have been in Casper around the time Mrs. Bush disappeared did not connect Glendol to the crime charged. This evidence did nothing more than raise a suspicion that Glendol may possibly have been in the area and may possibly have had something to do with the disappearance. We conclude the district court properly excluded this evidence.

[¶ 69] The statements of Ms. Hayfield, Ms. Lore, Deputy Rodstad and Ms. Moore, considered together, were apparently intended to show that Mrs. Bush was in the grocery store parking lot in the Bushes' pickup truck in the late afternoon on December 8, 1990; she argued with and left with a man in a Datsun pickup truck; and the man and the Datsun pickup were seen outside of Casper the following day. The difficulty with this proffered evidence is that there was no direct evidence that Glendol Bush was in Casper on December 8, 1990, or in the grocery store parking lot or that he was driving or ever drove a Datsun pickup. There was also no evidence that the Datsun pickup seen in the parking lot was the same Datsun pickup seen outside of Casper or that Glendol Bush had any connection with either one. There was also no evidence that the man seen walking near Fremont Canyon had any connection with the Datsun, was Glendol Bush, or was linked in any way with Mrs. Bush's disappearance. This evidence was speculative and did not link Glendol Bush to the crime

charged. Therefore, we hold that the district court properly excluded it.

[¶ 70] Mr. Bush asserts most strenuously that the district court violated his right to present his defense when it excluded the statements of Ms. Marks and Mr. Dryden that Glendol told them he was involved in the crime. The alleged statement to Ms. Marks implicated Mr. Bush, not Glendol; therefore, it is not clear how its exclusion violated Mr. Bush's right to present a defense. As for Mr. Dryden's proffered testimony, there was no showing that it was trustworthy or reliable. There was no independent evidence corroborating the hearsay statement that Glendol shot Mrs. Bush on Muddy Mountain, cut her up with a military shovel, stuffed her into a green army duffle bag and, perhaps, buried her. There also was no independent evidence corroborating that the Bushes' daughter, who according to the hearsay statement witnessed Glendol kill her mother, had stomach aches in the same place where he shot her. In fact, other evidence contradicted the statements Glendol Bush allegedly made to Mr. Dryden. For example, Ms. Marks' proffered testimony was that Glendol denied killing Mrs. Bush and stated that David Bush killed her. Additionally, all of the child's statements implicated her father in her mother's death.

[¶ 71] As the district court emphasized, pursuant to *Holmes*, 547 U.S. at 327, 126 S.Ct. 1727, the accused may introduce any *legal* evidence tending to prove that another person may have committed the crime with which the defendant is charged. Legal evidence is evidence that would be admissible at trial. Given that Mr. Dryden's testimony concerning Glendol Bush's statements to him was hearsay, the defense had the choice of proffering Glendol Bush's testimony or, if he was unavailable, showing that he was unavailable and proffering Mr. Dryden's testimony. In proffering Mr. Dryden's testimony, the defense had to show that Glendol Bush's statements to him were admissible as a statement against interest under W.R.E. 804(b)(3)[6] or within the catch-all exception

---

6. W.R.E. 804(b)(3) provides in pertinent part:
   Rule 804. Hearsay exceptions; declarant unavailable.

(b) *Hearsay exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

under W.R.E. 803(24).[7] The defense did none of this. Under these circumstances, we hold that the district court properly concluded Mr. Bush's offer of proof was insufficient and adhered to its original order excluding the testimony.[8]

### 4. Delay in Filing Charges

[¶ 72] Mr. Bush's final argument is that his Fifth Amendment due process rights were violated as a result of the fifteen and one-half year delay between his wife's disappearance and the filing of the murder charges. Given the delay, he asserts, evidence was lost, memories changed and he was prejudiced in preparing his defense. On this basis, Mr. Bush claims the district court erred in denying his pretrial motion to dismiss for violation of his due process rights. The State responds that Mr. Bush's Fifth Amendment due process rights were not violated by the delay because Mr. Bush cannot show that the delay caused substantial prejudice or that the prosecution intentionally delayed to gain tactical advantage. Whether Mr. Bush's constitutional right to due process was violated is a question of law that we review *de novo*. *Humphrey v. State*, 2008 WY 67, ¶ 32, 185 P.3d 1236, 1246 (Wyo.2008).

. . . .

(3) Statement Against Interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement[.]

7. W.R.E. 803(24) provides:

Other exceptions.—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence on which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

[¶ 73] In states like Wyoming, where there is no statute of limitations for criminal offenses, charges may be filed at any time during the accused's lifetime unless the delay is found to have violated his constitutional right to due process. *Id.*, ¶ 34, 185 P.3d at 1247. Adopting the rule articulated in *United States v. Marion*, 404 U.S. 307, 323–26, 92 S.Ct. 455, 465–66, 30 L.Ed.2d 468 (1971), we have held that pre-charging delay is not a violation of due process absent a showing of both an intentional delay by the state to gain a tactical advantage over the accused and actual prejudice resulting from the delay. *Humphrey*, ¶ 34, 185 P.3d at 1247. The burden of proving both intentional delay and actual prejudice lies with the accused. *Id.*

[¶ 74] Addressing the first prong of the test, Mr. Bush alleges that the only new evidence obtained during the fifteen and one-half year delay was the fact that Mrs. Bush was never found and this gave the State a tactical advantage. Mr. Bush makes no showing that this was in fact the reason for the delay. Under the circumstances of this case, where the victim's body had not been found, we are not willing to second guess the exercise of prosecutorial discretion. The

8. In ruling that the defense offer of proof was not sufficient to admit the alternate suspect evidence, the district court specifically advised counsel:

At this point, I am going to continue with my ruling granting the liminal[luminal] motion without prejudice to the defense to raise that at any such time as they think it might be appropriate during the trial.

. . . .

It is not to be referred to in opening unless something comes up and you bring it to my attention first.

* * * I can't imagine it being appropriate in *voir dire;* but it is not to be used in opening without my specific permission.

But I'm not precluding you from reapproaching the Court and asking for permission to probe into these things and specifically to be able to argue it in your closing statement if you think that is appropriate based on the evidence that has been established.

As this excerpt reflects, the district court's ruling on the matter was not final and left the defense the opportunity to show why Mr. Dryden's testimony was relevant and admissible. Apparently misunderstanding the ruling, the defense did not pursue efforts to present Mr. Dryden's testimony.

prosecutor at the time may have exercised his discretion to withhold prosecution until the body was found. Later, with new evidence in hand, most importantly the results of more advanced DNA technology, a different prosecutor exercised his discretion to proceed with prosecution. From these facts, we cannot conclude that the delay was intentional to gain a tactical advantage. Mr. Bush has not met his burden of proving the first prong of the test required to show his due process rights were violated by the delay.

[¶ 75] Turning to the second prong, Mr. Bush alleges that actual prejudice resulted in his case because evidence was destroyed or lost. He points to the pickup truck that his wife was driving when she disappeared, which the police searched and took blood samples from and then released to Mrs. Bush's parents who later sold it. He asserts that he had no opportunity to test, examine or perform an independent forensic examination of the truck and its contents to determine whether anyone else's DNA or fingerprints were present. He also points to a lost roll of film containing photographs taken by police during the search of his home. He claims the photographs would have answered questions concerning items the State claims were present or not present in the house at the time of the search. Finally, without referencing any particular witness, he asserts that witnesses' memories changed over the fifteen and one-half years and those who testified for him remembered less while witnesses for the State seemed to remember more.

[¶ 76] Actual prejudice, not possible prejudice, is the standard invoked with respect to the second prong of the test. *Vernier v. State*, 909 P.2d 1344, 1350 (Wyo.1996). Testimony at trial showed that police thoroughly searched and examined the pickup truck within a few days after Mrs. Bush disappeared in 1990 and submitted various parts for DNA testing, including the sun visor, seat covers, floor mats, passenger side metal threshold, gear shift knob, headlight switch, a dried blood flake and several swabs taken from the passenger and driver side doors and rear window. These items were preserved and available for additional testing prior to trial. Mr. Bush made no request to re-test any of the preserved items. These items were also produced at trial and Mr. Bush had a full opportunity to cross-examine the State's witnesses concerning removal and testing of the items. He does not specify other items from the truck that he would have tested had they been available nor does he indicate specifically what such testing would have revealed.

[¶ 77] Similarly, Mr. Bush fails to specify what the lost photographs would have shown or how they would have helped his case more than the photographs that were available and used at trial. Numerous photographs of the pickup truck and the interior of the Bush home were presented at trial and the defense had the opportunity to cross-examine the State's witness concerning the photographs. As previously noted, Mr. Bush does not identify any witness or testimony that changed over time or how it prejudiced his defense. Mr. Bush has failed to meet his burden of showing actual prejudice from the delay.

## CONCLUSION

[¶ 78] The district court did not abuse its discretion or violate Mr. Bush's Sixth Amendment confrontation right when it allowed a counselor and a psychiatrist to testify concerning statements made to them by the Bushes' daughter. The statements were properly admitted under W.R.E. 803(4) as statements made for purposes of medical diagnosis and treatment. Additionally, the daughter appeared at trial, took the oath, testified and was subject to cross-examination, thus satisfying the confrontation clause. The district court likewise did not abuse its discretion or violate Mr. Bush's confrontation right when it allowed Mr. Martin to testify by video teleconference. Under the circumstances, presentation of his testimony in that manner was necessary to further an important public policy and the reliability of the testimony was otherwise assured. The error in allowing Mrs. Martin to testify by video teleconference was harmless.

[¶ 79] The district court properly excluded evidence of an alternate suspect. Much of the proffered evidence was speculative and did not provide a nexus between the suspect

and the crime charged. As for the proffered testimony concerning the alternate suspect's hearsay statements, the defense failed to show that the statements were trustworthy and reliable. The district court also did not err in denying Mr. Bush's motion to dismiss on the basis of due process violations caused by the delay in charging him. Mr. Bush did not show actual prejudice or intentional prosecutorial delay to gain a tactical advantage.

[¶ 80]   Affirmed.