2017 WY 101

**Bryan Christopher SCHMIDT, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

S-16-0219

Supreme Court of Wyoming.

September 7, 2017

---

Representing Appellant: Office of the State Public Defender: Diane Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; and David E. Westling, Senior Assistant Appellate Counsel. Argument by Mr. Westling.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; and Katherine A. Adams, Assistant Attorney General. Argument by Ms. Adams.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

HILL, Justice.

[¶1] Bryan Schmidt was convicted of two counts of sexual abuse and one count of sexual exploitation of a minor. On appeal, Mr. Schmidt contends that the district court's decision to allow a school nurse to testify as to the victim's out-of-court statements violated his Sixth Amendment right to confront witnesses against him. He further contends that the district court abused its discretion in ruling the statements were admissible under W.R.E. 803(4) as statements made for purposes of medical diagnosis or treatment. We affirm.

## ISSUES

[¶2] Mr. Schmidt states the issues on appeal as:

I. Did the trial court violate Mr. Schmidt's right to confront witnesses against him by allowing out of court statements of a witness who had been adjudicated to be incompetent to testify?

II. Did the trial court err in ruling that statements made by D.V. to a school

nurse were admissible under W.R.E. 803(4)?

## FACTS

### A. Pre-Arrest Events

[¶3] In October 2015, Bryan Schmidt lived in an apartment in Laramie, Wyoming, with his girlfriend, TV, and her six-year-old daughter, DV. The three of them had lived together for about five years, and because DV's biological father had injured her by shaking her when she was seven months old, Mr. Schmidt was the sole father figure in DV's life during those five years. DV thus referred to Mr. Schmidt as "dad."

[¶4] DV was attending Beitel Elementary School in Laramie in October 2015 and had an individualized education plan (IEP) to help address learning difficulties created by the injuries she sustained as an infant. As part of her IEP, DV was assigned a paraprofessional, Sarah Sanchez. Ms. Sanchez worked with DV each school day for eight hours a day, providing academic support and support in her daily routines at school. Ms. Sanchez explained her daily routine with DV:

I greet her in the morning from the time she gets there, we spend recess and breakfast together, then we go into class and I sit adjacent to her and assist her through her day. The only time I'm not with her is during lunch.

[¶5] On October 27, 2015, DV reported an incident to Ms. Sanchez that was of concern to Ms. Sanchez. Ms. Sanchez described her conversation with DV:

Q. When, if ever, did D.V. first disclose to you that something may be going on that was concerning?

A. We were in the playground that morning before school started. She was playing hopscotch. She came over and told me that she had a secret and I bent down and she first whispered her secret in my ear that she was going to be a vampire for Halloween, then she told me she had another secret and she stated that her dog had licked the peanut butter off her bottom again.

Q. Was this the first time that D.V. mentioned something concerning peanut butter and her dog?

A. No. She had stated it the week before.

Q. And just to be clear, what date was this second disclosure?

A. October 27th. It was a Tuesday.

Q. Okay. And so about a week before would be around the 20th of October?

A. Correct.

Q. Okay. What specifically had she said around the 20th of October, to the best of your memory?

A. She had said the same thing. She said, "My dog licked the peanut butter off my butt again." I'm sorry, the first time she didn't say again.

Q. Okay.

A. But the first time, she said, "The dog licked peanut butter off my butt." The second time she said again.

Q. And what actions, if any, did you take the first time back on the 20th of October?

A. None. I made a mental note of it.

[¶6] Ms. Sanchez explained why DV's October 27th report caused her greater concern than her October 20th report.

Q. * * * My understanding is that when D.V. said that the dog licked peanut butter off of her the week before, you did not report that or take that further?

A. Correct.

Q. Yet it was on the 27th that you thought that warranted further inquiry?

A. Correct.

Q. * * * [T]he thing that was significant about it was the fact that she had repeated it?

A. She repeated it, she called it a secret, and she said again.

Q. Okay. I guess what I'm really asking is why didn't you report that the week prior?

A. I think I could make sense of it the week before, maybe the dog was just kind of rude, but D.V. is the type of child that could not continue a lie. She doesn't have that type of memory. So if it was something that she was making up, she couldn't

be able to tell me that again with the same details.

Q. Did it not strike you as odd in the area around the 20th, the first time that she would have had peanut butter on her bottom or other private parts?

A. On the 20th, she said it was peanut butter on her bottom, and at that point I dismissed it as a naughty dog, maybe she sat on a sandwich and that the dog kind of, you know, nipped at her or had it on her hands and wiped it on her pants and the dog kind of nipped at her like that.

Q. So am I correct that you didn't inquire—you didn't ask her how she got peanut butter on her bottom the first time?

A. Correct.

Q. When she came up to you on the 27th, my understanding is that she said the dog licked peanut butter off her bottom again, correct?

A. She said, "I have a secret. My dog licked peanut butter off my butt again."

Q. This time did you ask her how the peanut butter got onto her butt?

A. I asked her, "What do you mean by your butt?" And she pointed with her hand and said underneath and pointed to her private area. I asked her how did it get there. She said, with her hand in motion, "My dad put it there."

[¶7] When DV made her October 27th statements to Ms. Sanchez, Carlos Mellizo, the school counselor, was nearby on the playground. Ms. Sanchez told him the two of them needed to discuss something with DV, and they then took DV to Mr. Mellizo's office. Ms. Sanchez asked DV to tell Mr. Mellizo what she had said earlier, and DV repeated her report that "her dog had licked the peanut butter off her butt again." Ms. Sanchez and Mr. Mellizo asked DV to demonstrate using dolls that Mr. Mellizo kept in his office. Ms. Sanchez explained:

We asked her to model that for us. She got the dolls out and she showed us how with two fingers her dad had taken peanut butter out of a jar and placed it on the private area of the doll. We had a dog that we—like a stuffed dog, and she took the dog and modeled with the licking motion

with her tongue how the dog was licking the peanut butter on the doll.

[¶8] Following that demonstration, Mr. Mellizo asked the school nurse, Sabra Hoffman, to join them in his office. Mr. Mellizo asked Ms. Hoffman to bring some sort of medicated cream, and he also located a container of SunButter (a peanut butter substitute made from sunflower seeds). Mr. Mellizo wanted these items to help determine whether DV may have misunderstood a parent's application of medicinal cream and to clarify that it was in fact peanut butter that was applied to DV's vaginal area.

[¶9] When Ms. Hoffman joined the discussion in the office, DV repeated her earlier statements and demonstration with dolls and chose the SunButter over the cream when asked which substance had been applied to her vaginal area. DV also drew a picture on a dry erase board and pointed to the vaginal area of the picture she had drawn of herself to show where the peanut butter had been applied. She also physically demonstrated what had occurred.

[¶10] After their discussion with DV, the three adults understood DV to be telling them that her dad, Mr. Schmidt, had placed peanut butter on her vagina and allowed the dog to lick the peanut butter from DV's vagina, and that on one occasion, the dog bit DV's vagina. DV was returned to her classroom, and Ms. Sanchez, Mr. Mellizo, and Ms. Hoffman informed the school principal of DV's statements.

[¶11] After consulting with the principal, Ms. Sanchez reported DV's statements to the Department of Family Services (DFS). DFS then contacted law enforcement, and two detectives from the Laramie Police Department responded to the report that same day. The police department's immediate investigation included: interviews of DV, DV's mother, and Mr. Schmidt; a medical examination of DV; and a search of the apartment Mr. Schmidt shared with DV and her mother.

[¶12] Detective Joel Senior was the primary detective on the case and participated in the search of the apartment. The search yielded a jar of peanut butter that appeared to have the impressions from someone's fin-

gers in the peanut butter and small, very fine black hair bent over the rim. In a trash container in the bathroom across from DV's bedroom, Detective Senior recovered tissue paper with blood stains on it and paper towels with what appeared to be peanut butter on them. Detective Senior also observed a black puppy in the apartment.

[¶13] DV's medical examination revealed a puncture wound to the labia majora of her vagina that was heated and reddened. With respect to the interviews of Mr. Schmidt and DV's mother, Detective Senior stated the following in his probable cause affidavit to support an arrest warrant for Mr. Schmidt:

6. During an interview that occurred on October 27, 2015, Bryan Schmidt admitted that about a week prior, on Wednesday, which would have been October 21, 2015, he had picked up the minor child victim from daycare and taken her home. According to Schmidt, the minor child had been unclothed while about to take a bath around 5:00 p.m. and the minor child had been bitten on her vagina by the dog. Schmidt stated he put toilet paper on the wound and once the wound had stopped bleeding, he put the minor child in the bath tub. Schmidt went on to say that the minor child was in the bath tub when the minor child victim's mother had come home from work and he told her what had happened.

7. Schmidt also admitted to watching pornography involving incest and beastiality (sic) * * *.

8. Schmidt went on to say that he follows incest and beastiality (sic) blogs on an app on his phone because he is interested in why people do those things.

* * * *

10. During a follow-up interview with the minor child victim's mother, the mother stated that she had had Schmidt pick up the minor child a week ago and that she had not learned of the injury to the minor child's vagina until she had arrived home from work.

* * * *

12. When asked if Schmidt had any interest in incest or beastiality (sic), the minor child victim's mother stated that Schmidt

had shown her some beastiality (sic) videos and, specifically, that Schmidt had shown her videos of women having sex with dogs. She did advise that Schmidt had asked her to participate in beastiality (sic), however, she had refused.

## B. Post-Arrest Proceedings

[¶14] On October 30, 2015, the State filed a felony information against Mr. Schmidt charging him with one count of sexual exploitation of a child, one count of second degree sexual abuse of a minor, and one count of third degree sexual abuse of a minor. Defendant pled not guilty to the charges, and the matter was set for a jury trial.

[¶15] On February 12, 2016, the State filed a request for a hearing to determine DV's competence to testify at trial and to determine admissibility of DV's statements to school officials should the district court find DV incompetent to testify. Rather than holding one combined hearing, the district court first held a competency hearing on February 24, 2016. On February 25, 2016, the court issued an order declaring DV incompetent to testify. The court found:

9. * * * The evidence produced at the competency hearing revealed the following, in pertinent part:

a. D.V. was able to accurately state her first, middle, and last name;

b. D.V. correctly stated she is currently 6 years old, and attends Beitel Elementary School, in Laramie, Wyoming. She was also able to recall that she like[s] to read and play games in school;

c. D.V. correctly stated she currently lives with her grandparents, who take her to school, and that she eats two breakfasts (one at home and one at school each day), although she could not recall what she ate yesterday for breakfast;

d. D.V. accurately recalled her birth date and recalled that her mother baked a cake for her birthday last July 2015;

e. However, D.V. acknowledged that she did not know what a "lie" is;

f. D.V. inaccurately testified that her sister, Phoenix, is younger and lives with her "all the time," when, in fact, Phoenix is an older sibling and only visits in the summers;

g. D.V. incorrectly answered that a statement "this carpet is red" (when the carpet was blue) was the truth;

h. Finally, D.V. recounted, at length, that she has seen a real dragon in the "puppy store," that she petted the dragon, that the dragon was red, and that she was not afraid because he was nice even though he could breath fire.

10. After conducting the hearing, the Court concludes that, although not intentionally so, D.V. does *not* have an understanding of her obligation to speak the truth; nor the mental capacity at the time of the occurrence about which she is to testify. D.V. does *not* have the ability to receive an accurate impression of it; a memory sufficient to retain an independent recollection of the occurrence; the capacity to express in words her memory of the occurrence; and/or the capacity to understand simple questions about it.

[¶16] On March 8, 2016, the district court held an evidentiary hearing to determine the admissibility of DV's statements, and on March 9, 2016, the court issued its order. The court first addressed whether admission of DV's statements would violate Mr. Schmidt's Sixth Amendment Confrontation Clause rights. The court ruled the statements would not run afoul of the Sixth Amendment because the statements were not made for the purpose of creating or preserving evidence with which to prosecute Mr. Schmidt and were thus not testimonial.

[¶17] The district court next addressed whether the statements were admissible under either the catchall exception to the hearsay rule, W.R.E. 804(b)(6), or the exception for statements made for the purpose of medical diagnosis or treatment, W.R.E. 803(4). The court rejected the catchall exception as a basis for admitting DV's statements, concluding:

26. Here, there are some factors that weigh in favor of "circumstantial guarantees of trustworthiness," most particularly the consistency of the statements; that several individuals overheard the statements; and the existence of corroborating evidence. However, other facts weigh against admissibility, including: some statements were made in response to questioning by others who were in a position of power and influence over D.V.; the exact phrasing of the questions asked is unknown—some may have been leading in nature; the statements lacked detail such as location and time; the statements were not made under oath; and D.V. was then and is now incompetent to understand the nature of an "oath" or even "truth." Additionally, the nature of Mr. Schmidt's relationship with D.V. is unclear, as Mr. Schmidt was D.V.'s mother's boyfriend. This Court has no information on whether D.V. approved of Mr. Schmidt's role in her life or had any motive to fabricate these stories. So, while this Court does not question whether the statements were, in fact, made, it has grave concerns as to the trustworthiness of the content of those statements.

27. This Court concludes that the State has **not** presented sufficient circumstantial guarantees of trustworthiness to justify their admissibility as a hearsay exception under Wyoming Rule of Evidence 804(b)(6). (emphasis in original)

[¶18] The district court then turned to the W.R.E. 803(4) hearsay exception for statements made for the purpose of medical diagnosis or treatment. The court concluded that DV's statements to her paraprofessional and the school counselor were not admissible under the exception, but her statements to the school nurse were admissible under the exception. The court reasoned:

33. Here, the Court cannot go so far as to consider that D.V.'s statements to Ms. Sanchez, the paraprofessional, or Mr. Mellizo, the school counselor, were made for purposes of medical diagnosis or treatment. Both of those individuals clearly testified that their purpose in speaking with D.V. was to determine what happened in the context of their need to report the incident to authorities as mandatory reporters of sexual abuse. The intent of the

interviews was forensic, not medical. Neither one sought to diagnose or treat D.V.

34. However, the statements made to Ms. Hoffman, the school nurse, were elicited to determine D.V.'s wellbeing and to assess any current injury and the need for treatment thereof, and for the purpose of determining whether the child may be in immediate danger and, thus, subject to protective custody. Clearly those statements made by D.V. were admissible under Rule 803(4), even to the extent the information was elicited by Ms. Sanchez and Mr. Mellizo in Ms. Hoffman's presence. *See Hayes v. State*, 935 P.2d 700 (Wyo. 1997).

35. In that context, Ms. Hoffman learned that D.V.'s "dad" had used his fingers to apply peanut butter to her vaginal area, on at least two occasions, and that, on at least one of those occasions, the family dog had bitten D.V. while being allowed to lick the peanut butter off D.V.'s vaginal area. Although D.V. indicated that it "hurt so bad," she claimed not to be in pain at the time of the conversation with Ms. Hoffman.

36. The gathering of this information was used by Ms. Hoffman, in her capacity as a school nurse, for purposes of medical diagnosis or treatment and describing past or present symptoms or pain, or the inception or general character of the cause thereof insofar as reasonably pertinent to diagnosis or treatment. Although Ms. Hoffman did not undertake a physical examination of D.V., she most certainly was inquiring into her physical and mental state so as to determine the need for additional medical assessment and treatment, whether at Ivinson Memorial Hospital or by another medical provider, and for the purpose of determining whether the child was in immediate danger and subject to protective custody.

37. The Court finds that D.V.'s statements made in the presence of Ms. Hoffman are appropriately admitted under Wyoming Rule of Evidence 803(4).

[¶19] A jury trial was held March 23-24, 2016. Sabra Hoffman testified to what occurred after she entered Carlos Mellizo's office on October 27, 2015:

A. Well, I just kind of came in and sat down on the floor, and they had been in there with DV talking with her and the dolls, the play therapy dolls that I know he has in his office were out and they asked DV to tell me—well, at first they said, you know, you remember the school nurse.

\* \* \* \*

\* \* \* Anyway, they just asked her to tell me what she had told them. And—

\* \* \* \*

A. So she said—didn't act like she wanted to say anything at the moment, and they said, "Well, can you show her what you said happened?" And she had a toy doll with her and she also had a little toy stuffed puppy with her and she said, "My dad put peanut butter on my butt and the dog licked it off." And they said, "Well, can you show us what happened?" And so she, you know, had the doll in her hand and she said, "put peanut butter on my butt." "Well, where did he put peanut butter?" And she, you know, applied it to the vaginal area of the doll and then she took the puppy and, you know, motioned it licking and, you know—and then she said that it also bit her, licked and bit the peanut butter off of her \* \* \*.

\* \* \* \*

Q. Okay. And then what happened after she finished with the demonstration?

A. We were trying to discern whether this truly did happen or maybe it was something like, you know, they were treating her for some rash or condition going on in that area and wanted to be sure that it was truly peanut butter that was put on her or was it, say, diaper rash cream or something like that that she is being treated for something like that. And asked her, you know did what your dad put on you look like, you know, this tube of cream here, this lotion, or did it look like what came out of the—you know, the peanut butter, the SunButter? And she pointed to the SunButter and said that that's what it was, peanut butter. "It was peanut butter" is what she kept saying.

\* \* \* \*

Q. And after you give a demonstration with the SunButter and the lotion, what happened next?

A. Next we—you know, just trying to get more details and just really be clear on what she was saying, you know, again, "Can you show us what happened?" And at that point, you know—and then, you know, where did it happen? You know, what happened when this happened? And she, at that point, laid down on the floor of the office. I—I was the—she said, "I was laying down," and she laid down like this (indicating), you know, arms at her side, and then she lifted up her knees and her knees were spread apart and open and the peanut butter was here, and then she still had the little stuffed dog and the dog was here licking and biting and it hurt. And when she said that it hurt when it happened, I felt, well, I needed to assess if there were any injuries there currently, and I tried to ask her, you know, "Are you hurt right now? Does anything hurt right now?" Trying to see if this just happened, or, you know, maybe it had been several days since it happened, but not really sure what the time line was. And she said, "No, nothing hurts now. Nothing hurts now."

Q. Well, when she was doing that—that demonstration—

A. Um-hum.

Q. —where was she pointing to where the peanut butter had been put on her?

A. To her vaginal area, the front side there.

Q. Okay.

A. Yeah. And then Mr. Mellizo asked, "Were your clothes on when this happened?" And she said no, that her pants were off. And at that point, you know, she had consistently said the same thing several times now. You know, we were concerned that this was something that just needed to be looked into further, so ...

Q. Now, when DV was describing this event to you, what, if anything, did she say about how the peanut butter was put on?

A. Well, she would—when she was talking to us and talking about the peanut butter being put on, she, you know, always would mimic do this two-finger motion and then show always that it went onto her vaginal area is where it was (inaudible).

[¶20] In addition to Ms. Hoffman's testimony, the State presented:

—the testimony of Detective Senior describing his investigation and the items collected from Mr. Schmidt's apartment;

—the testimony of a chemist from the Food and Drug Administration that the substance on the paper towels found in the bathroom waste basket was consistent with peanuts or peanut butter;

—the testimony of DV's mother concerning the dog bite to DV's vagina, the events of October 27, 2015, and Mr. Schmidt's interest in bestiality;

—the testimony of a sexual assault nurse examiner (SANE) describing the injury found on DV's vagina;

—the testimony of Wyoming State Crime Lab analysts relating the results of tests run on evidence removed from the Mr. Schmidt's apartment, including that the DNA profile for the blood found on tissue removed from the bathroom waste basket was consistent with DV's DNA profile, and that hairs removed from the peanut butter jar and recovered from DV's vaginal swab showed characteristics more typical of non-human hair than human hair;

—the recorded law enforcement interview of Mr. Schmidt; and

—a recorded telephone call between Mr. Schmidt and his mother in which Mr. Schmidt stated, "Everybody's gonna f***ing know what I did."

[¶21] The jury found Mr. Schmidt guilty on all three counts charged, and the district court thereafter sentenced Mr. Schmidt to concurrent terms of: five to eight years on count one, sexual exploitation of a child; fifteen to eighteen years on count two, second degree sexual abuse of a minor; and eight to fifteen years on count three, third degree sexual abuse of a minor. Mr. Schmidt filed a timely notice of appeal to this Court.

## STANDARD OF REVIEW

[¶22] Mr. Schmidt claims that the district court's decision to allow the school

nurse to testify about DV's report of abuse violated his Sixth Amendment right to confront witnesses against him and was error under W.R.E. 803(4). Mr. Schmidt's Sixth Amendment challenge is a question of law we review de novo. *Bruce v. State*, 2015 WY 46, ¶ 19, 346 P.3d 909, 916 (Wyo. 2015). We review his challenge to the court's Rule 803(4) ruling for an abuse of discretion:

> "We review claimed error concerning the improper admission of evidence for abuse of discretion and will not reverse the trial court's decision absent a clear abuse." *Szymanski v. State*, 2007 WY 139, ¶ 15, 166 P.3d 879, 883 (Wyo.2007) (citing *Bromley v. State*, 2007 WY 20, ¶ 8, 150 P.3d 1202, 1206 (Wyo.2007)). "A trial court abuses its discretion when it could not have reasonably concluded as it did. In this context, 'reasonably' means sound judgment exercised with regard to what is right under the circumstances and without being arbitrary or capricious." *Id.* (internal citation omitted). Upon a finding of abuse of discretion, we must then determine whether the error was prejudicial. " 'Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made.' " *Mersereau v. State*, 2012 WY 125, ¶ 17, 286 P.3d 97, 106 (Wyo.2012) (quoting *Rolle v. State*, 2010 WY 100, ¶ 9, 236 P.3d 259, 264 (Wyo.2010)).

*Toth v. State*, 2015 WY 86A, ¶ 29, 353 P.3d 696, 705-06 (Wyo. 2015).

## DISCUSSION

[¶23] For ease of discussion, we address first Mr. Schmidt's claim that the district court abused its discretion in admitting the testimony under Rule 803(4) and then turn to his Sixth Amendment claim.

### A. Admissibility under Rule 803(4)

[¶24] Under Rule 802 of the Wyoming Rules of Evidence, hearsay statements are generally not admissible. The rules define hearsay as:

> (c) *Hearsay.*—"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

W.R.E. 801 (LexisNexis 2017).

[¶25] The rules also, however, provide a number of exceptions to the inadmissibility of hearsay, including an exception for statements made for the purpose of medical diagnosis or treatment, the exception on which the district court relied in admitting Sabra Hoffman's testimony. Rule 803 states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * * *
>
> (4) *Statements for Purposes of medical diagnosis or treatment.*—Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

W.R.E. 803(4) (LexisNexis 2017).

[¶26] The Rule 803(4) hearsay exception is rooted in "the likelihood that the declarant was motivated to tell the truth by the belief that the effectiveness of the treatment depended upon the accuracy of the information relayed." *McLaury v. State*, 2013 WY 89, ¶ 10, 305 P.3d 1144, 1146 (Wyo. 2013) (citing *Oldman v. State*, 998 P.2d 957, 961 (Wyo. 2000)). To ensure the reliability contemplated by this exception, a proper foundation for the statements is required. *Id.*, ¶ 11, 305 P.3d at 1147.

[¶27] Foundation for a Rule 803(4) statement looks to: 1) the declarant's motive in making the statement, which "must be consistent with the purposes of promoting treatment [or diagnosis]"; and 2) the content of the statement, which "must be such as is reasonably relied on by a physician in treatment or diagnosis." *Griggs v. State*, 2016 WY 16, ¶ 115, 367 P.3d 1108, 1140 (Wyo. 2016) (quoting *Stephens v. State*, 774 P.2d 60, 72 (Wyo.1989)). In applying this two-part test, foundation for a Rule 803(4) statement "can be established by considering one rationale or to some degree both rationales." *Griggs*, ¶ 116, 367 P.3d at 1140 (quoting *McLaury*,

¶ 15, 305 P.3d at 1149). Where the testimony concerns a child's statements to a medical professional, we have held that the foundational requirements are satisfied if:

the child's statements were consistent with the purposes for which the witness became involved with the child, and the witness relied on the statements in connection with diagnosis and treatment of the child.

*Bush v. State*, 2008 WY 108, ¶ 22, 193 P.3d 203, 209 (Wyo. 2008) (citing *Simmers v. State*, 943 P.2d 1189, 1197–1198 (Wyo. 1997)); *see also Hayes v. State*, 935 P.2d 700, 703 (Wyo. 1997); *Betzle v. State*, 847 P.2d 1010, 1017 (Wyo. 1993); *Owen v. State*, 902 P.2d 190, 196 (Wyo. 1995).

[¶28] Mr. Schmidt contends that foundation was lacking for Ms. Hoffman's testimony because: Ms. Hoffman did not conduct a physical examination of DV and did not treat her; DV said she was not presently in pain and showed no awareness she was being diagnosed or treated; Ms. Hoffman's questions were primarily asked through Ms. Sanchez; and, given the district court's competence ruling and the fact that DV turned the questions into a game where she played teacher and the three adults played students and raised their hands to ask questions, DV likely had no appreciation of the effect her statements might have on her diagnosis and treatment. We disagree that any of these considerations undermines the district court's finding that foundation had been established for Ms. Hoffman's testimony.

## 1. School Nurse's Lack of Physical Examination and "Treatment"

[¶29] Mr. Schmidt's argument that Rule 803(4) does not apply because Ms. Hoffman did not conduct a physical examination or treat DV is premised on a narrow definition of diagnosis or treatment that finds no support in our precedent. When we apply the definition of diagnosis and treatment required by our precedent, it is clear that Ms. Hoffman was engaged in the diagnosis and treatment of child abuse, and the district court reasonably concluded that the proper foundation had been established for her testimony.

[¶30] In *Goldade v. State*, 674 P.2d 721, 727 (Wyo. 1983), *cert. denied*, 467 U.S. 1253, 104 S.Ct. 3539, 82 L.Ed.2d 844 (1984), this Court held that the exception to the hearsay rule contained in Rule 803(4) is to be afforded a liberal interpretation in cases of child abuse because of "the manifest need to protect the most helpless members of our society from violence on the part of others." To that end, the Court recognized that diagnosis and treatment in a case of child abuse extends beyond the examination and treatment of physical injuries and requires attention to "emotional and psychological damage" to the child. *Goldade*, 674 P.2d at 725. As important, diagnosis and treatment of child abuse includes protecting the child from further abuse.

The policy of this state as it is found incorporated in the child protection statutes, makes vital the determination by physicians and others who are treating suspected child abuse cases of whether the injuries were inflicted deliberately. They also must decide whether the child may be in imminent danger, which determination is necessary in determining the propriety of temporary protective custody.

*Goldade*, 674 P.2d at 726; *see also Oldman v. State*, 998 P.2d 957, 962 (Wyo. 2000) (recognizing prevention of further abuse as part of treatment in domestic abuse case).[1]

[¶31] During the pretrial evidentiary hearing to determine the admissibility of Ms. Hoffman's testimony, Ms. Hoffman testified:

Q. Okay. When you specifically were involved and, you know, asked D.V. questions on having her demonstrate these things, what was your primary goal? What

---

1. Other jurisdictions have concluded likewise. *See, e.g., Cooley v. State*, 76 So.3d 210, 213 (Miss. Ct. App. 2011) (child abuse treatment encompasses treating emotional and psychological injuries and prevention); *Hawkins v. State*, 348 Ark. 384, 72 S.W.3d 493, 496 (2002) (citation omitted) ("[P]revention of recurrence of the injury is a paramount consideration in the treatment of children who have been sexually abused in the home."); *State v. Tracy*, 482 N.W.2d 675, 681-82 (Iowa 1992) (treatment for child abuse includes preventing recurrent abuse); *United States v. Renville*, 779 F.2d 430, 438 (8th Cir. 1985) (information that abuser is household member is "reasonably pertinent" to course of treatment which includes removing child from home).

were you looking to find out when you were talking to D.V.?

A. I was looking for any current injuries that would need to be looked into, primarily. And then just finding out her well-being, you know, what had happened to her, what she was really trying to tell us.

Q. What, if any, concerns did you have about her going back home at that time?

A. At that time, I didn't know if it was a safe place to go. I was concerned it wouldn't be.

[¶32] Ms. Hoffman's purposes in interacting with and listening to DV were to determine what happened with DV, to determine whether what happened to DV was deliberate, and to determine whether DV was in danger of further abuse. These purposes are consistent with the diagnosis and treatment of child abuse, and we thus conclude that the necessary foundation was laid: DV's statements were consistent with the purposes for which Ms. Hoffman became involved with her, and Ms. Hoffman relied upon the statements in connection with DV's diagnosis and treatment.[2]

## 2. DV's Understanding of Diagnosis and Treatment

█ [¶33] Mr. Schmidt's suggestion that because DV was not in pain when she made her statements to Ms. Hoffman, she likely had no appreciation that she was being diagnosed or treated, and no understanding of the importance of her statements, has no bearing on our conclusion. As we previously discussed, the focus in determining foundation for a child's statements to a medical professional is not on the child's subjective understanding or motivation, but rather on whether the child's statements "were consistent with the purposes for which the witness became involved with the child." *Bush*, ¶ 22, 193 P.3d at 209. Indeed, we have observed:

Public policy justifies a more liberal approach that should prevail in cases such as

this because, although the child may be too young to know what is actually germane to his or her treatment, still the child has no reason to fabricate and, presumably, furnishes the physician a full account of the occurrence, simply as a part of the story of the injury. Lloyd Leva Plaine, Comment, *Evidentiary Problems in Criminal Child Abuse Prosecutions*, 63 GEO. L.J. 257 (1974).

*Owen*, 902 P.2d at 195 (quoting *Betzle*, 847 P.2d at 1020-21).

[¶34] A finding that DV had a subjective understanding of her diagnosis and treatment, and what might be germane to that, was not required to establish foundation for Ms. Hoffman's testimony. The district court therefore did not abuse its discretion in admitting Ms. Hoffman's testimony without first determining DV's subjective understanding or motivation.

## 3. Questioning through Ms. Sanchez

█ [¶35] Ms. Hoffman testified that at one point during the discussion with DV, DV turned the discussion into a game where she played teacher and the adults played students who would raise their hands to ask questions. In the course of this game, Ms. Hoffman raised her hand and when called upon, asked if DV had any current "owies." DV would not answer her question and said only Ms. Sanchez could ask questions. Ms. Sanchez then repeated Ms. Hoffman's question and DV responded that she had no current owies. Mr. Schmidt contends that this game playing, and the fact that most of the questions were asked by Ms. Sanchez or Mr. Mellizo, belies any finding that the discussion was truly an interaction between Ms. Hoffman as a nurse and DV as a patient seeking treatment. We again disagree.

█ [¶36] First, as we have discussed, DV's subjective understanding of the conversation with these adults and its implications does not determine foundation. Additionally,

---

2. Ms. Hoffman's role as school nurse constrained her from looking under DV's clothing to perform a physical examination and treat DV's vaginal wound. This does not detract from the finding that Ms. Hoffman was engaged in the diagnosis and treatment of DV's abuse. Ms. Hoffman, acting with Mr. Mellizo and Ms. Sanchez, took steps, through their report to the principal and subsequent report to DFS, that allowed DV to receive proper care for her physical wounds, and any psychological or emotional wounds, and protection from further abuse.

we have held that statements of a child are admissible under Rule 803(4) even when the child does not make those statements directly to the medical professional.

A statement need not be made to a physician, and statements made to hospital attendants, or even family members, may be admitted under Rule 803(4) if the foundation conditions are satisfied.

*Stephens,* 774 P.2d at 73 (citations omitted); *see also Valmain v. State,* 5 So.3d 1079, 1083 (Miss. 2009) (observing Rule 803(4) "casts its net wider than the patient-physician relationship" and citing cases for majority rule that exception is not confined to statements made by patient directly to medical provider).

[¶37] In this case, foundation for Ms. Hoffman's testimony was established. Regardless of whether DV spoke directly to Ms. Hoffman or to one of the other adults in the room, the statements were consistent with the purpose of Ms. Hoffman's presence and were relied upon by Ms. Hoffman in her diagnosis and treatment of DV. The fact that Ms. Sanchez asked most of the questions does not affect the admissibility of Ms. Hoffman's testimony.

[¶38] Additionally, we find nothing in the role-playing game that undermined the reliability of DV's statements. Factors relevant to the reliability of a child's statements regarding abuse include the spontaneity of the statements, consistency in the statements, unusual knowledge of sexual acts, and child-like terminology. *State v. Robinson,* 153 Ariz. 191, 735 P.2d 801, 811-12 (1987); *see also Betzle,* 847 P.2d at 1016-17 (approving district court's consideration of some of the same factors in evaluating reliability of child's reported sexual abuse). DV's first report to Ms. Sanchez on the playground was spontaneous, reflected an unusual knowledge of a sex act, and was made in child-like terms. DV's descriptions remained consistent throughout her statements and during the role-playing game. The role-playing game was one aspect of the interaction with DV, and we find no basis to conclude that it affected the trustworthiness that is otherwise inherent in Rule 803(4) statements. *See McLaury,* ¶ 11, 305 P.3d at 1147 (discussing the inherent trustworthiness of Rule 803(4) statements).

### 4. District Court's Competency Determination

[¶39] Mr. Schmidt last contends that the district court's competency determination calls into question the reliability of DV's statements. In his briefing, he particularly focuses on DV's statements about a dragon during her competency hearing and the absence of cross-examination "to determine if the story she told at school was a similar fantasy." We find nothing in the district court's competency determination that would render DV's statements unreliable and therefore again reject Mr. Schmidt's argument.

[¶40] First, a competency determination does not also determine the reliability of a child's out-of-court statement. As one court explained:

The determination of whether the child victim is competent to testify, which is determined at the time of trial, is a separate analysis from the determination of whether hearsay statements meet the required standard of reliability or trustworthiness as judged at the time the statement was made.

*State v. Waddell,* 351 N.C. 413, 527 S.E.2d 644, 651 (2000); *see also Lancaster v. People,* 200 Colo. 448, 615 P.2d 720, 722 (1980) (rejecting claim that testimonial incapacity of declarant due to her age rendered her hearsay assertion inadmissible).

[¶41] Additionally, there is much to distinguish DV's statements to school officials from the statements she made about a dragon during her competency hearing. First, dragons, though fictional, are creatures one expects a child to have been exposed to in stories, movies, games, or toys. One does not expect a child to be familiar with the sex act DV reported to school officials. Also distinguishing the statements is the spontaneity of DV's statements to Ms. Sanchez on the playground. DV initiated the contact with Ms. Sanchez and volunteered the information with no prompting or questions from Ms. Sanchez. In contrast, DV did not raise the topic of dragons during the competency hear-

ing, and her statements about dragons were in direct response to the district court's questions. The exchange was as follows:

THE COURT: Hmm. So tell me something, have you ever seen a dragon?

THE WITNESS: Yeah.

THE COURT: You have? Was it a big one or a little one?

THE WITNESS: A little one.

THE COURT: Did it breathe fire?

THE WITNESS: Um-hum.

THE COURT: It did? Where did you see him?

THE WITNESS: In the puppy store.

THE COURT: In the puppy store? They had a puppy dragon?

THE WITNESS: Yeah.

THE COURT: What color was it?

THE WITNESS: Red and White.

THE COURT: Oh. Did you want to take him home?

THE WITNESS: Um-hum.

THE COURT: What did your mom say?

THE WITNESS: She could take—she could take—she could take all the kind of stuff, tigers, something in the puppy store.

THE COURT: Yeah? And she—did she say it was probably not a good idea to take the dragon home?

THE WITNESS: Um-hmm.

THE COURT: Yeah? I can see that. That would be a problem. You might get burned.

THE WITNESS: Um-hum.

* * *

THE COURT: Okay. Anybody have any questions that you wanted to have me ask?

[PROSECUTOR]: No, sir. I don't believe so, Your Honor.

[DEFENSE COUNSEL]: No, sir.

THE COURT: Hang on just one second. When you saw that dragon in the—in the puppy store.

THE WITNESS: Um-hum?

THE COURT: Was it a real dragon?

THE WITNESS: Um-hmm.

THE COURT: Okay. You weren't scared or anything?

THE WITNESS: Huh-uh.

THE COURT: Oh, all right.

THE WITNESS: I am very happy.

THE COURT: You were very happy?

THE WITNESS: Um-hum.

THE COURT: Was it—he must have been a nice one. Did you pet him?

THE WITNESS: (Nods head.)

THE COURT: He lets you pet him?

THE WITNESS: He is very nice.

THE COURT: Oh, all right. Well, I'm glad to hear that. Sometimes they're kind of ornery.

THE WITNESS: Uh-hum.

[¶42] We do not question the district court's competency determination, but we disagree with Mr. Schmidt's characterization of the above exchange as illustrating "a penchant for fantasy." DV did not tell a story about a dragon but instead answered specific questions about a dragon. The record contains no indication of similar questioning during DV's interaction with the three school officials. DV volunteered her initial report to Ms. Sanchez and in response to non-leading prompts described what she meant with dolls, a physical demonstration, and a drawing.

[¶43] The district court made a competency determination that addressed DV's competence to testify at trial. That determination was separate from the court's determination of the reliability of DV's out-of-court statements when they were made, and we find nothing in the competency hearing or order that undermines the foundation for Ms. Hoffman's testimony.[3]

3. We are likewise untroubled by the district court's finding that DV's statements lacked the trustworthiness required for admission under the catchall exception. The court made that determination based on factors that differ from those considered under Rule 803(4) and more particularly the State's failure to prove those factors. Again, once foundation is established for the admission of a Rule 803(4) statement, the statement is deemed reliable and no additional showing of the statement's trustworthiness is required. *McLaury*, ¶ 11, 305 P.3d at 1147.

[¶44] For all of the above reasons, we find no abuse of discretion in the district court's decision to allow Ms. Hoffman's testimony.

## B. Sixth Amendment Confrontation Clause

[¶45] Mr. Schmidt contends that because DV was unavailable to testify and he had no opportunity to cross-examine her, the admission of her statements through Ms. Hoffman's testimony violated his confrontation rights under the Sixth Amendment. We find no constitutional violation.

[¶46] The Sixth Amendment protects a defendant's right to confront witnesses against him. *Bruce v. State*, 2015 WY 46, ¶ 21, 346 P.3d 909, 918 (Wyo. 2015) (citing *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 1369, 158 L.Ed.2d 177 (2004)). We have said:

> [O]wing to that protection, testimonial statements of a witness absent from trial are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 1369, 158 L.Ed.2d 177 (2004); *see also Anderson v. State*, 2014 WY 13, ¶ 27, 317 P.3d 1108, 1118 (Wyo. 2014); *Rodriguez v. State*, 2010 WY 170, ¶ 9, 245 P.3d 818, 823 (Wyo.2010); *Szymanski v. State*, 2007 WY 139, ¶ 16, 166 P.3d 879, 883 (Wyo.2007). Stated as a three-part test, the Sixth Amendment confrontation clause bars the admission of an out-of-court statement if the statement is testimonial, the declarant is unavailable, and the defendant had no opportunity to cross-examine the declarant concerning the statement. *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374; *Szymanski*, ¶ 16, 166 P.3d at 883.

*Bruce*, ¶ 21, 346 P.3d at 918.

[¶47] In this case, there is no question that the declarant, DV, was unavailable to testify and that Mr. Schmidt had no opportunity to cross-examine DV concerning her statements. The question we must address is whether DV's statements were testimonial within the meaning of the Sixth Amendment.

[¶48] A statement made to a law enforcement officer is testimonial "when the circumstances objectively indicating that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Bruce*, ¶ 24, 346 P.3d at 919 (quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273–74, 165 L.Ed.2d 224 (2006)). Whether a statement made to someone who is not a law enforcement officer is testimonial presents a different question, which the Supreme Court recently addressed in *Ohio v. Clark*, —— U.S. ——, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015).

[¶49] In *Clark*, the Supreme Court addressed whether a child's statements to his teacher, in which he identified his abuser, were testimonial. *Clark*, —— U.S. ——, 135 S.Ct. at 2181. Because the analysis the Court used in *Clark* is fact-based, and the facts of that case are particularly relevant to the case before this Court, we include those here.

> Darius Clark, who went by the nickname "Dee," lived in Cleveland, Ohio, with his girlfriend, T.T., and her two children: L.P., a 3–year–old boy, and A.T., an 18–month–old girl. Clark was also T.T.'s pimp, and he would regularly send her on trips to Washington, D.C., to work as a prostitute. In March 2010, T.T. went on one such trip, and she left the children in Clark's care.

> The next day, Clark took L.P. to preschool. In the lunchroom, one of L.P.'s teachers, Ramona Whitley, observed that L.P.'s left eye appeared bloodshot. She asked him " '[w]hat happened,' " and he initially said nothing. Eventually, however, he told the teacher that he " 'fell.' " When they moved into the brighter lights of a classroom, Whitley noticed " '[r]ed marks, like whips of some sort,' " on L.P.'s face. She notified the lead teacher, Debra Jones, who asked L.P., " 'Who did this? What happened to you?' " According to Jones, L.P. " 'seemed kind of bewildered' " and " 'said something like, Dee, Dee.' " Jones asked L.P. whether Dee is "big or little," to which L.P. responded that "Dee is big." Jones then brought L.P. to her supervisor, who lifted the boy's shirt, revealing more injuries.

Whitley called a child abuse hotline to alert authorities about the suspected abuse.

When Clark later arrived at the school, he denied responsibility for the injuries and quickly left with L.P. The next day, a social worker found the children at Clark's mother's house and took them to a hospital, where a physician discovered additional injuries suggesting child abuse. L.P. had a black eye, belt marks on his back and stomach, and bruises all over his body. A.T. had two black eyes, a swollen hand, and a large burn on her cheek, and two pigtails had been ripped out at the roots of her hair.

*Clark*, —— U.S. ——, 135 S.Ct. at 2177–78 (footnote and citations omitted).

[¶50] Because L.P. had been found incompetent to testify, his statements to his teachers were admitted under a state rule of evidence that allowed admission of reliable hearsay by child abuse victims. *Clark*, —— U.S. ——, 135 S.Ct. at 2178. A jury convicted Clark on all but one of the charged counts, and Clark challenged his conviction on Sixth Amendment grounds. *Id.* A state appellate court reversed his conviction, and the Ohio Supreme Court affirmed that reversal. *Id.*

[¶51] The Supreme Court reversed, holding that L.P.'s statements to his teachers were not testimonial. *Clark*, —— U.S. ——, 135 S.Ct. at 2181. In reaching that conclusion, the Court did not adopt a categorical rule that statements made to individuals who are not law enforcement officers do not implicate Sixth Amendment concerns, but it did observe that "such statements are much less likely to be testimonial than statements to law enforcement officers." *Id.* The Court held:

> In the end, the question is whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the conversation was to "creat[e] an out-of-court substitute for trial testimony."

*Clark*, —— U.S. ——, 135 S.Ct. at 2180 (quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011)); *see also Villarreal v. State*, 2017 WY 81, ¶ 15, 398 P.3d 512 (Wyo. 2017).

[¶52] Drawing on its precedent, the Court outlined a number of factors relevant to determining the primary purpose of a conversation, none of which were singularly determinative: 1) the existence of an ongoing emergency; 2) the formality of the conversation, with a "formal station-house interrogation" being more likely to have a purpose of creating evidence for prosecution and a less formal setting being less likely to have such a purpose; and 3) the applicability of a rule of hearsay that is designed to identify the statement as reliable. *Clark*, —— U.S. ——, 135 S.Ct. at 2180 (citations omitted). Adding on to these considerations, the Court cited the declarant's age as another factor:

> Statements by very young children will rarely, if ever, implicate the Confrontation Clause. Few preschool students understand the details of our criminal justice system. Rather, "[r]esearch on children's understanding of the legal system finds that" young children "have little understanding of prosecution." Brief for American Professional Society on the Abuse of Children as *Amicus Curiae* 7, and n. 5 (collecting sources). * * * On the contrary, a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all.

*Clark*, —— U.S. ——, 135 S.Ct. at 2182.

[¶53] The final factor the Court added to its analysis was the context of the statement, including the questioner's identity and the relationship between the questioner and declarant.

> Courts must evaluate challenged statements in context, and part of that context is the questioner's identity. *See id.*, at 369, 131 S.Ct. 1143. Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. *See, e.g., Giles [v. California]*, 554 U.S. [353], at 376, 128 S.Ct. 2678 [171 L.Ed.2d 488 (2008) ]. It is common sense that the relationship between a student and his teacher is very

different from that between a citizen and the police. We do not ignore that reality.

*Clark,* —— U.S. ——, 135 S.Ct. at 2182.

[¶54] The Supreme Court's application of these factors led it to the conclusion that L.P.'s statements to his teachers were not made for a primary purpose of providing evidence for his abuser's prosecution and were therefore not testimonial.

> L.P.'s statements occurred in the context of an ongoing emergency involving suspected child abuse. When L.P.'s teachers noticed his injuries, they rightly became worried that the 3–year–old was the victim of serious violence. Because the teachers needed to know whether it was safe to release L.P. to his guardian at the end of the day, they needed to determine who might be abusing the child. Thus, the immediate concern was to protect a vulnerable child who needed help. * * * [T]he emergency in this case was ongoing, and the circumstances were not entirely clear. L.P.'s teachers were not sure who had abused him or how best to secure his safety. Nor were they sure whether any other children might be at risk. As a result, their questions and L.P.'s answers were primarily aimed at identifying and ending the threat. * * * The teachers' questions were meant to identify the abuser in order to protect the victim from future attacks. Whether the teachers thought that this would be done by apprehending the abuser or by some other means is irrelevant. * * *
>
> There is no indication that the primary purpose of the conversation was to gather evidence for Clark's prosecution. On the contrary, it is clear that the first objective was to protect L.P. At no point did the teachers inform L.P. that his answers would be used to arrest or punish his abuser. L.P. never hinted that he intended his statements to be used by the police or prosecutors. And the conversation between L.P. and his teachers was informal and spontaneous. The teachers asked L.P. about his injuries immediately upon discovering them, in the informal setting of a preschool lunchroom and classroom, and they did so precisely as any concerned

citizen would talk to a child who might be the victim of abuse. This was nothing like the formalized station-house questioning in *Crawford* or the police interrogation and battery affidavit in *Hammon*.

*Clark,* —— U.S. ——, 135 S.Ct. at 2182 (footnote omitted).

[¶55] We see nothing to distinguish DV's statements in this case from L.P.'s statements in *Clark*. DV's statements and the questioning by school officials were spontaneous and done in the informal setting of first the playground and then the school counselor's office. There is no indication that DV made her statements intending them to be used in a prosecution or even knew such a result was possible. Nor is there any indication that the school officials asked their questions with the goal of obtaining a prosecution. The evidence is clear that their intention was to determine whether DV had been hurt and was in danger of further injury. We thus conclude DV's statements were not made for the primary purpose of creating evidence for Mr. Schmidt's prosecution and were not testimonial.

[¶56] Finally, we reject Mr. Schmidt's suggestion that the school officials' status as mandatory reporters should change this result. We agree with the Supreme Court's reasoning:

> Clark's efforts to avoid this conclusion are all off-base. He emphasizes Ohio's mandatory reporting obligations, in an attempt to equate L.P.'s teachers with the police and their caring questions with official interrogations. But the comparison is inapt. The teachers' pressing concern was to protect L.P. and remove him from harm's way. Like all good teachers, they undoubtedly would have acted with the same purpose whether or not they had a state-law duty to report abuse. And mandatory reporting statutes alone cannot convert a conversation between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for a prosecution.

*Clark,* —— U.S. ——, 135 S.Ct. at 2182-83.

### CONCLUSION

[¶57] The district court did not abuse its discretion in admitting DV's statements to

the school nurse under Rule 803(4), and allowing the nurse's testimony did not violate Mr. Schmidt's Sixth Amendment right to confront witnesses against him. Affirmed.

HILL, Justice, delivered the opinion of the Court; FOX, Justice, filed a dissenting opinion in which DAVIS, Justice, joins.

FOX, Justice, dissenting, in which DAVIS, Justice, joins.

[¶58] I respectfully dissent. I would find that the district court abused its discretion when it found that the statements DV made to Ms. Hoffman fit under the hearsay exception for statements made for purposes of medical diagnosis or treatment. W.R.E. 803(4).

[¶59] Ms. Hoffman was one of three school personnel who questioned DV in order to determine what had occurred. There was no indication that DV believed Ms. Hoffman was providing medical care, and there is no evidence that Ms. Hoffman provided DV any medical care. I would tend to agree with the majority when it states "that Ms. Hoffman was engaged in the diagnosis and treatment of child abuse," however, child abuse is a crime, not a medical condition. As one leading commentator has observed, the medical diagnosis and treatment exception is based "on the process of providing conventional medical care, which requires doctors to learn basic facts from patients, and not on the process of providing social remedies aimed at detecting abuse, identifying and punishing abusers, and preventing further mistreatment." Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:75 (4th ed. June 2013).

[¶60] We allow certain exceptions to the general rule against hearsay, "exceptions [which] were generally designed to encompass situations in which the four hearsay dangers are substantially lessened, and thus in effect the hearsay statements assume a greater degree of trustworthiness." *Hopkin-*

son v. State*, 632 P.2d 79, 129 (Wyo. 1981), cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982) (citing 4 Louisell & Mueller, *Federal Evidence*, § 14, at 69-70 (1980)). The trustworthiness associated with the medical diagnosis and treatment exception is based on "the likelihood that the declarant was motivated to tell the truth by the belief that the effectiveness of the treatment depended upon the accuracy of the information relayed." *McLaury v. State*, 2013 WY 89, ¶ 10, 305 P.3d 1144, 1146 (Wyo. 2013) (citing *Oldman v. State*, 998 P.2d 957, 961 (Wyo. 2000)). But here, the declarant, DV, was acting out a story, mostly in response to questioning by her paraprofessional, Ms. Sanchez, and there is nothing at all to indicate that she was motivated to tell the truth so that Ms. Hoffman could treat her. To the contrary, as the district court found, Ms. Hoffman "did not undertake a physical examination of D.V.," and after the interview with school personnel, DV was sent to the SANE nurse for examination.

[¶61] The majority relies on *Goldade v. State*, a case in which this Court affirmed the admission of medical treaters' testimony regarding the abused child's identification of her abuser, 674 P.2d 721, 724 (Wyo. 1983), *cert. denied*, 467 U.S. 1253, 104 S.Ct. 3539, 82 L.Ed.2d 844 (1984), even though we recognized "the general rule that statements attributing fault usually are not admissible under rules identical to Rule 803(4)." *Id.* at 725. There, we found that "the function of the court must be to pursue the transcendent goal of addressing the most pernicious social ailment which afflicts our society, family abuse, and more specifically, child abuse." *Id.* at 727. We felt that important policy consideration justified a "liberal interpretation" of W.R.E. 803(4), "insofar as it applies in child abuse cases." *Id.* While I share the *Goldade* Court's profound alarm regarding child abuse, I believe that we should address that concern, while adhering to our obligation to the rule of law, by adopting a rule that fits, rather than straining the rule we have.[4] *See,*

---

4. [M]any commentators have expressed concern that in the course of laudable efforts to combat child abuse, prosecutors, courts, and others have occasionally overreached. *See, e.g.,* Michael H. Graham, *The Confrontation Clause, the Hearsay*

*Rule, and Child Sexual Abuse Prosecutions: The State of the Relationship,* 72 Minn.L.Rev. 523, 529 n.26 (1988) ("The successful prosecution of child sexual abuse cases should not be permitted to distort the hearsay exception for statements

e.g., *Sharp v. Commonwealth*, 849 S.W.2d 542, 546 (Ky. 1993) ("There may be a temptation among judges to let pity for small children who may have been victimized by vicious adults overcome their duty to enforce the rules of evidence."); *State v. Myatt*, 237 Kan. 17, 697 P.2d 836, 842 (1985) ("The problem with 'stretching' the existing exceptions in this manner is the destruction of the certainty and integrity of the exceptions.").

for medical diagnosis or treatment. Almost anything is relevant to the diagnosis or treatment of psychological well being, and far too many untrustworthy statements are relevant to preventing repetition of the abuse."); Robert P. Mosteller, *Child Sexual Abuse and Statements for the Purpose of Medical Diagnosis or Treatment*, 67 N.C.L.Rev. 257, 258 (1989). (Applications of medical diagnosis or treatment exception in child abuse cases "have tended to expose the thinness of the justification for extending the exception to statements made without any view toward treatment.")

7 Handbook of Fed. Evid. § 803:4 (7th ed. Nov. 2016 update) *§ 803:4 Rule 803(4): statements made for purposes of medical diagnosis or treatment. See also* Robert P. Mosteller, *The Maturation and Disintegration of the Hearsay Exception for Statements for Medical Examination in Child Sexual Abuse Cases*, 65-WTR Law & Contemp. Probs. 47 (Winter 2002).

5. Evid R 807 Hearsay exceptions; child statements in abuse cases

(A) An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing any sexual act performed by, with, or on the child or describing any act of physical violence directed against the child is not excluded as hearsay under Evid.R. 802 if all of the following apply:

(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In

[¶62] Several states have already adopted such a rule. In *Ohio v. Clark*, —— U.S. ——, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015), the case relied upon by the majority in its discussion of the confrontation clause, the child victim's statements were admitted under Ohio Rule of Evidence 807, which the Court noted "allows the admission of reliable hearsay by child abuse victims." *Clark*, —— U.S. ——, 135 S.Ct. at 2178.[5] Other states have

making this determination, the court shall not consider whether there is independent proof of the sexual act or act of physical violence.

(2) The child's testimony is not reasonably obtainable by the proponent of the statement.

(3) There is independent proof of the sexual act or act of physical violence.

(4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.

(B) The child's testimony is "not reasonably obtainable by the proponent of the statement" under division (A)(2) of this rule only if one or more of the following apply:

(1) The child refuses to testify concerning the subject matter of the statement or claims a lack of memory of the subject matter of the statement after a person trusted by the child, in the presence of the court, urges the child to both describe the acts described by the statement and to testify.

(2) The court finds all of the following:

(a) the child is absent from the trial or hearing;

(b) the proponent of the statement has been unable to procure the child's attendance or testimony by process or other reasonable means despite a good faith effort to do so;

(c) it is probable that the proponent would be unable to procure the child's testimony or attendance if the trial or hearing were delayed for a reasonable time.

(3) The court finds both of the following

(a) the child is unable to testify at the trial or hearing because of death or then existing physical or mental illness or infirmity;

(b) the illness or infirmity would not improve sufficiently to permit the child to testify if the trial or hearing were delayed for a reasonable time.

The proponent of the statement has not established that the child's testimony or attendance is not reasonably obtainable if the child's refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of the statement for the purpose of preventing the child from attending or testifying.

similar rules or statutes which allow for hearsay statements by children in abuse cases, while requiring various safeguards to ensure their reliability.[6] *See* Robert G. Marks, *Should We Believe the People Who Believe the Children?: The Need for A New Sexual Abuse Tender Years Hearsay Exception Statute*, 32 Harv. J. on Legis. 207, 237, 252-54 (1995) (proposing a model statute which "balances the prosecutorial necessity of admitting trustworthy hearsay, the values inherent in the Confrontation Clause, and the current hearsay rules and exceptions," and noting that "most states have enacted specific statutes under which child hearsay—not otherwise admissible under the state's other hearsay exceptions—would be admissible").

[¶63] Compliance with the rules of evidence, of course, does not necessarily resolve confrontation clause issues, which must be analyzed independently of the rules of evidence governing hearsay. *See, e.g., People v. Moreno*, 160 P.3d 242, 246 (Colo. 2007) (finding that previous revision of Colorado statute, Colo. Rev. Stat. Ann. § 13-25-129, allowing out-of-court statements of child sex abuse

victims, to the extent it allows admission of testimonial statements without an opportunity for cross-examination, "violates the confrontation guaranty of the Sixth Amendment") (citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004)); *Grabau v. Dep't of Health, Bd. of Psychology*, 816 So.2d 701, 709 (Fla. Dist. Ct. App. 2002) (prior version of Florida statute denies due process); *State in Interest of A.R.*, 447 N.J.Super. 485, 149 A.3d 297, 319 (2016) (child's statements were testimonial and violated confrontation clause, even though admissible under New Jersey Rule of Evidence 803(c)(27)). Here, the majority correctly concludes that the confrontation clause is not violated, where the hearsay statements were not testimonial. However, because we do not have a rule that would permit the admission of DV's hearsay statements to the three school officials, I would reverse and remand for a new trial.

(C) The court shall make the findings required by this rule on the basis of a hearing conducted outside the presence of the jury and shall make findings of fact, on the record, as to the bases for its ruling.
Ohio R. Evid. 807.

6. *See, e.g.,* Alaska Stat. Ann. § 12.40.110 (West 2017) *Hearsay evidence in prosecutions for sexual offenses;* Cal. Evid. Code § 1228 (West 2017) **Admissibility of certain out-of-court statements of minors under the age of 12; establishing elements of certain sexually oriented crimes; notice to defendant;** Cal. Evid. Code § 1360 (West 2017) *Statements describing an act or attempted act of child abuse or neglect; criminal prosecutions; requirements;* Colo. Rev. Stat. Ann. § 13-25-129 (West 2017) *Statements of child victim of unlawful sexual offense against a child or of child abuse—hearsay exception;* Del. Code Ann. tit. 11, § 3513 (West 2017) *Hearsay exception for child victim's or witness's out-of-court statement of abuse;* Fla. Stat. Ann. § 90.803(23) (West 2017) *Hearsay exception; statement of child victim;* Ind. Code Ann. § 35-37-4-6 (West 2017) *Application of section; "protected person" defined; applicable offenses; admissibility of statement or videotape; notice to defendant; jury instructions; hearing as evidence;* Mass. Gen. Laws Ann. ch. 233, § 81 (West 2017) *Criminal proceedings; out-of-court statements describing sexual contact; admissibility;* Minn. Stat. Ann. § 595.02 Subd. 3 (West 2017) *Certain out-of-court statements admissible;* Miss. R. Evid. 803(25) (West 2017) *Tender Years*

*Exception;* Mo. Ann. Stat. § 491.075 (West 2017) *Statement of child under fourteen or vulnerable person admissible;* Mont. Code Ann. § 46-16-220 (West 2017) *Child hearsay exception—criminal proceedings;* Nev. Rev. Stat. Ann. § 51.385 (West 2017) *Admissibility; notice of unavailability or inability of child to testify;* N.J. R. Evid. 803(c)(27) (West 2017) *Statements by a Child Relating to a Sexual Offense;* Okla. Stat. Ann. tit. 12, § 2803.01 (West 2017) *Statements of children not having attained 13 years or incapacitated persons describing acts of physical abuse or sexual contact—Admissibility in criminal and juvenile proceedings;* Or. R. Evid. 803(18a) (West 2017) *Hearsay exception; availability of declarant immaterial;* 42 Pa. Cons. Stat. § 5985.1 (LexisNexis 2017) *Admissibility of certain statements;* S.C. Code Ann. § 17-23-175 (West 2017) *Admissibility of out-of-court statement of child under twelve; determination of trustworthiness; notice to adverse party;* S.D. Codified Laws § 19-19-806.1 (West 2017) *Statement by child under age thirteen or child with developmental disability regarding sex crime, physical abuse, or neglect;* Utah R. Crim. P. 15.5 (West 2017) *Out of Court Statement and Testimony of Child Victims or Child Witnesses of Sexual or Physical Abuse—Conditions of Admissibility;* Vt. R. Evid. 804a (West 2017) *Hearsay Exception; Putative Victim Age 12 or Under; Person with a Mental Illness or Developmental Disability;* Wash. Rev. Code Ann. § 9A.44.120 (West 2017) *Admissibility of child's statement—Conditions.*